[No. B047676. Second Dist., Div. Four. May 28, 1991.]

GEORGE E. CARPENTER, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent.

**COUNSEL**

Dewberry & Emmer and Howard A. Emmer for Plaintiff and Appellant.

James K. Hahn, City Attorney, John T. Neville, Thomas C. Hokinson and Richard M. Helgeson, Assistant City Attorneys, for Defendant and Respondent.

**OPINION**

**GOERTZEN, J.**—Plaintiff/appellant George E. Carpenter (appellant) sued defendant/respondent the City of Los Angeles (City), for damages he suffered when he was shot by an unknown assailant allegedly in retaliation for having testified against a defendant in a preliminary hearing. The City successfully moved for summary judgment.

This appeal asks us to determine whether a city, through its police department, owes a duty to warn a witness, assisting in a criminal prosecution, about information it has received from a reliable source, regarding a threat to the witness's life, after earlier assuring the witness that he had no cause for concern. For the reasons discussed below, we hold that such a duty is owed and that no statutory immunity bars this suit. As a triable issue exists regarding whether the City breached this duty, we reverse.

FACTS

The facts are not in dispute. As related in various declarations and depositions filed in support of and in opposition to the motion for summary judgment, those facts show the following:

At pertinent times, appellant was employed by United Artist Theatres, Inc., at one of its movie theaters in North Hollywood. At about 12:45 a.m. on October 14, 1984, appellant was making a night deposit of theater receipts when he was accosted by one Daniel Jenkins. Jenkins stuck a gun in appellant's face, fired twice, and took the money appellant was depositing. Though Jenkins had fired, appellant was not physically injured, and no bullets were recovered at the scene.

Shortly thereafter, officers from the Los Angeles Police Department arrived, and appellant provided them a description of Jenkins and his car. Appellant was later contacted by Detective Thomas Williams from the North Hollywood Robbery Division, and appellant repeated his description of Jenkins. About two weeks later, Detective Williams showed appellant 12 photographs from which he identified Jenkins.

Appellant was called to testify at Jenkins's preliminary hearing, where he identified Jenkins as the robber. After appellant had testified, he was sitting in the court hallway talking to the arresting officer when Jenkins approached. Jenkins spoke to appellant, saying, "Why did you lie? I didn't do anything to you. God punishes people who lie." Appellant responded, "God also punishes people who shoot at others and rob them." When Jenkins began to answer, the arresting officer interrupted and warned Jenkins that he might be rearrested for harassing a witness.

As a result of this encounter, appellant was concerned about his safety. Later that day, appellant asked Detective Williams about Jenkins's criminal history and whether appellant had cause to be concerned. Detective Williams told appellant that he did not have anything to worry about, that Jenkins was "a street punk" who was "basically into" grand theft auto and small robberies. Appellant's concern was somewhat allayed. He never requested protection from any police officer or from anyone from the district attorney's office.

Appellant spoke to Detective Williams by telephone several times before the trial, mostly regarding subpoenas he had received. Appellant described his association with Detective Williams as follows: "I was victim/witness in a felony crime and . . . he was guiding me through the . . . procedures. [¶] . . . He was my coach, so to speak. I was kind of a Rookie and he was . . . bringing me through ground I had never been through before."

In late April or early May of 1985, Sergeant Alan Pesanti, assigned to Wilshire Division, received information from an informant. The informant told Pesanti that, about one month before, Jenkins had approached the informant about doing "a contract hit" on a theater owner in the Valley who

had testified against Jenkins in a preliminary hearing. Jenkins had tried to hire the informant to perform the murder and had told the informant that he (Jenkins) was aware of the theater owner's personal habits because he had followed him from his business to his home. Jenkins knew that the theater owner ate at a pizza restaurant close to the movie theater. At that time, Sergeant Pesanti had used the informant 30 to 50 times and considered him to be reliable.

Sergeant Pesanti spoke to Robbery Detective Slack and Robbery Detective Supervisor Carl Thompson at the Wilshire Station. He relayed the information regarding Jenkins's "contract hit" and his ongoing relationship with the informant to Detective Slack.

After he researched and found the pertinent case number, Detective Slack called North Hollywood Division and asked for the robbery unit. The phone was answered by Detective Fred Riscen, who was known to Detective Slack. Detective Slack told Detective Riscen the information he had regarding "a theater manager and a man who was in custody by the name of Jenkins." Detective Riscen responded that that was one of North Hollywood's cases, and he pulled the case to compare case numbers with Detective Slack. The numbers matched.

As Detective Slack had been raised in North Hollywood, the two detectives talked about the area, and Detective Slack recognized exactly which theater's receipts had been stolen. Detective Slack related the information he had received from Sergeant Pesanti and informed Detective Riscen that the informant was willing to cooperate in the matter. While they discussed the possibility of surveillance, Detective Riscen identified appellant as being the theater manager involved in the case. That was the first time Detective Slack became aware of the victim's name.

Detective Riscen, however, did not remember any telephone conversations with Detective Slack which occurred during 1985.

In the meantime, appellant continued to be under subpoena to testify at Jenkins's criminal trial. Before he could testify, however, appellant was shot in the head, abdomen and legs by an unknown assailant on July 4, 1985. This assault occurred while appellant was on his dinner break at an Italian restaurant near the theater where he worked. Up to that time, Detective Williams had not offered to provide appellant with any type of protection. After he was shot, appellant was placed in a witness protection program and sent out of state.

Though the informant's statement about Jenkins's solicitation had been relayed about two months before appellant was shot, appellant had not been

informed of Jenkins's attempts to "do a contract hit" on his life. Appellant did not learn about the informant's warning until March 1986, when he returned to Los Angeles to testify in the preliminary hearing in the related murder case of Detective Williams. Detective Williams was shot and killed on October 31, 1985, while the jury was in deliberation on the robbery case of which appellant was the victim. Jenkins was convicted of this homicide. During the course of the investigation into Detective Williams's murder, the district attorney's office had learned about the informant's statement regarding Jenkins's attempt to "do a contract" on appellant's life. On March 29, 1986, a deputy district attorney relayed this information to appellant.

### PROCEDURAL HISTORY

After being granted relief from the requirements of the Government Tort Claims Liability Act, appellant filed suit against the City on April 27, 1987. Focusing on the City's failure to warn him about Jenkins's attempt to arrange a contract to kill him, the gist of appellant's complaint was that as a witness in a felony prosecution he had a special relationship with the City, through its police department, such that it owed him a duty of care which required it to warn him about Jenkins's threat to his life. Paragraph 5 of the complaint listed the various factors which created the special relationship as follows: "5. Having solicited plaintiff's cooperation in the prosecution of its criminal case, having initiated multiple contacts with plaintiff by and through its police officers, including but not limited to Detective Thomas Williams, for the sole purpose of preparing its case and preparing the plaintiff as a prosecution witness, having informed plaintiff that the perpetrator of the crime presented no danger to plaintiff's life or safety, and having induced plaintiff to rely and depend upon this information, a special relationship existed" between appellant and the City.

The City moved for summary judgment. Its primary argument was that no special relationship existed between appellant and the City's police department; consequently, the City owed no duty of care to appellant. Alternatively, the City asserted that if a duty did exist, Government Code immunities barred the action.

Appellant's opposition to the motion for summary judgment expanded the factual basis for liability by emphasizing the comments made by Detective Williams. By declaration, appellant asserted that he relied upon Detective Williams's assurance that Jenkins was just a street punk, whom appellant need not fear and, therefore, did not act to protect himself; that had Detective Williams told him that he was not allowed to disclose any information about Jenkins's past criminal record, appellant would have continued to be concerned about his personal safety and would have taken steps to protect

himself;[1] specifically, appellant would have requested that United Artists, Inc. transfer him to its corporate offices during the pendency of the robbery case; and that, at a minimum, appellant would have acted to alter his daily routine.

The court granted the City's motion for summary judgment for the reasons argued by the City. The notice of ruling was served by mail on December 20, 1989, and appellant filed his initial notice of appeal on January 16, 1990. The judgment was entered on March 16, 1990; appellant filed an amended notice of appeal on May 11, 1990.

### STANDARD OF REVIEW

■ "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. [Citation.] Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. [Citations.] [¶] The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory. [Citation.] The affidavits of the moving party are strictly construed and those of his [or her] opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion. [Citation.]" (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134], internal quotation marks omitted.)

"This task is limited to addressing those issues or theories of liability raised in plaintiff's complaint. The papers filed by the party opposing summary judgment must also be directed to the issues raised in the complaint; therefore, the opposing papers may not create issues outside of the pleadings. [Citations.]" (*Fireman's Fund Ins. Co. v. City of Turlock* (1985) 170 Cal.App.3d 988, 994 [216 Cal.Rptr. 796].)

With these rules in mind, we turn to the case at bench.

### DISCUSSION

We begin our discussion with comments made by Justice Tobriner in *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], about the nature of duty. ■ "[L]egal duties are not discoverable facts of nature, but merely con-

---

[1]The City had argued that Williams was precluded by Penal Code sections 11141 and 13302 from disclosing Jenkins's criminal record to appellant.

clusory expressions that, in cases of a particular type, liability should be imposed for damage done. . . . The assertion that liability must . . . be denied because defendant bears no duty to plaintiff begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . [Duty] is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. [Citation.]" (*Id.*, at p. 434, internal quotation marks omitted.)

For the reasons set forth below, we hold that considerations of policy mandate a finding that a duty of care was owed to appellant such that the City should have warned him about Jenkins's threat to his life.

"As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection. [Citations.]" (*Leger* v. *Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1458 [249 Cal.Rptr. 688], internal quotation marks omitted.)

While neither party has cited a California case directly in point and our independent research has revealed no such case, we conclude that appellant, as a witness in a criminal prosecution who had been assured that the defendant posed no real danger to him, enjoyed a special relationship with the City, through its police department, such that the City owed appellant a duty of care, which required it to warn appellant about Jenkins's subsequent threat to appellant's life.

We are aware that a line of cases exists which narrowly circumscribes the liability of a governmental entity based on police failure to act reasonably in protecting members of the public. In order to find a special relationship, these cases have held that the plaintiff must plead reliance by the plaintiff on the officers' conduct and statements made by the officers which induced a false sense of security and thereby worsened the plaintiff's position. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 28 [192 Cal.Rptr. 233, 664 P.2d 137].) "Recovery has been denied, however, for injuries caused by the failure of police personnel to respond to requests for assistance, the failure to investigate properly, or the failure to investigate at all, where the police had not induced reliance on a promise, express or implied, that they would provide protection. [Citations.]" (*Id.*, at p. 25.)

Here, appellant has pleaded that he relied on assurances that Jenkins presented no danger. Though sparingly pleaded in his complaint, appellant's

affidavit, which we must construe liberally, asserts that as a result of Detective Williams's statement that Jenkins was a street punk, he did not act to protect himself in any way. In other words, Detective Williams's comments "induced a false sense of security and thereby worsened" appellant's position. (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 28.)

Moreover, the cases noted above are distinguishable. Most involve a member of the general public, seeking assistance from an officer within the ambit of the officer's normal course of duty.[2] None involve a witness who had been asked to assist in a felony prosecution.

More pertinent to our discussion is the analysis done in *Walker* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1393 [238 Cal.Rptr. 146]. In *Walker,* the court addressed the issue of whether a private citizen who was asked to assist an animal control officer in the apprehension of a roaming dog could maintain a cause of action for the injuries the citizen sustained in the course of assisting the control officer. Noting the factors necessary to finding a special relationship, discussed above, the *Walker* court concluded that as the animal control officer requested plaintiff's assistance with the task which carried a foreseeable risk of injury, a special relationship was created, giving rise to a duty of care toward plaintiff. (*Id.,* at p. 1402.)

---

[2]See, e.g., *Williams* v. *State of California, supra,* 34 Cal.3d 18, where the court held that the situation of a highway patrol officer stopping to aid an injured motorist does not, in itself, create a special relationship, requiring the officer to secure information or preserve evidence for civil litigation between the motorist and third parties; *Weissich* v. *County of Marin* (1990) 224 Cal.App.3d 1069 [274 Cal.Rptr. 342], where the court found law enforcement agencies had no continuing duty to warn based on voluntary promises made 11 years before decedent was murdered by an individual he had prosecuted for arson 30 years before; *Lopez* v. *City of San Diego* (1987) 190 Cal.App.3d 678 [235 Cal.Rptr. 583], where the court found no direct connection between the police conduct and an increased risk of harm when police delayed over an hour before taking action to neutralize a deranged gunman and rescue his hostages and eventual murder victims; *Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6 [120 Cal.Rptr. 5], where the court found police had breached no duty when they failed to respond to a plea for help made 45 minutes before a homicide; *Antique Arts Corp.* v. *City of Torrance* (1974) 39 Cal.App.3d 588 [114 Cal.Rptr. 332], where the court found no duty was breached when a police dispatcher delayed 10 minutes after an alert before broadcasting a burglary in progress notice.

But see: *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453], where the court found a breach of duty when an officer investigating an accident directed the plaintiff to follow him into the middle of the intersection where plaintiff was hit by another car; *Mann* v. *State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82], where the court found a duty of care when a car sideswiped a stalled vehicle causing injury after a highway patrol officer had stopped to aid the stranded motorist, placed his patrol car with flashing lights behind the stalled cars on the freeway, and after calling for a tow truck departed without warning; *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508], where the court found a breach of a duty of care when a deputy sheriff promised to warn a decedent if a prisoner who had made threats on her life were released and failed to do so.

In reaching its holding, the *Walker* court especially stressed the benefit society derived from a citizen, upon request, assisting a public employee in the performance of the employee's public function. (*Walker* v. *County of Los Angeles, supra,* 192 Cal.App.3d at pp. 1401-1402.) We believe that, here, the societal benefit derived is of an even greater importance. Criminal prosecution would screech to a grinding halt without the assistance of witnesses. (See *Schuster* v. *City of New York* (1958) 5 N.Y.2d 75 [180 N.Y.2d 265, 154 N.E.2d 534].)

Here, the City sought out appellant's assistance in identifying Jenkins when Detective Williams presented the photo line-up to appellant. In fact, the police department and the prosecutor, representing all citizens, specifically requested and needed appellant's assistance in order to prosecute the robbery case. (See *Walker* v. *County of Los Angeles, supra,* 192 Cal.App.3d at pp. 1398-1402.) It is of little consequence that the appellant did not request or seek protection from the police. Here, the duty arises because the police, after assuring appellant that Jenkins posed no real danger, received reliable information that appellant's life was in danger and failed to warn him. Not only was the informant considered reliable, but the information he relayed was so specific as to create a strong inference of reliability. Jenkins had told the informant that he had followed appellant home; that he knew that appellant regularly ate his dinner at the Italian restaurant in the same center where the theater was located, the very restaurant where appellant ultimately was shot. In addition, when Detective Slack spoke to Detective Riscen at the North Hollywood robbery division, appellant was identified by name as the person who was the target of Jenkins's threat. Thus, the information was complete—the police knew from a reliable source that Jenkins was seeking to have a witness in his criminal prosecution killed; that Jenkins had undertaken a preliminary investigation to assist the prospective assailant; that he knew where the witness lived and dined regularly; and that appellant was the intended victim of the assault. (Cf. *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 754-755 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) This was not a "nonspecific threat[ ] of harm directed at [a] nonspecific victim[ ]." (*Id.,* at p. 754, italics omitted.)

Considerations of policy mandate a finding that the City owed appellant a duty of care. (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 434.) Reasonable care required that the police, after lulling appellant into a false sense of security, inform him of this very real threat. (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 28; *Schuster* v. *City of New York, supra,* 5 N.Y.2d 75 [154 N.E.2d at p. 537].) We are speaking here of a duty to warn. As evidenced by the Witness Protection Program in which appellant

was placed after being shot, the City already recognizes it has a duty to protect certain witnesses.[3]

Having found that the City owes a duty of care to appellant, we next must consider whether any statutory immunities exist which would bar this suit. (*Williams* v. *State of California, supra,* 34 Cal.3d at pp. 22-23.)

The City contends that the following statutory immunities bar this action: Civil Code section 47, subdivisions (b) and (c);[4] and Government Code sections 845 and 820.2.[5] We do not agree.

For the first time on appeal, the City asserts that the immunities codified in Civil Code section 47, subdivisions (2) and (3) bar this action. As to Civil Code section 47, subdivision (c), this qualified privilege primarily relates to actions in defamation; hence, it does not relate to this appeal. (See generally 5 Witkin, Summary of Cal. Law (9th ed. 1980) Torts, §§ 519-528, pp. 609-618.)

█ While the "litigation" privilege of section 47 subdivision (b) has been expanded beyond defamation claims (see *Silberg* v. *Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365]), we do not agree with the City's position that it bars this action. *Silberg* involved a comment made by an attorney representing one of the parties, during the course of the litigation, about a topic directly related to it. Here, the comments made by Detective Williams were unrelated to the pending robbery prosecution and were not made in the course of a judicial proceeding to achieve the objects of the robbery prosecution. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 212.)

█ The statutory immunities which merit fuller discussion are those found in Government Code sections 845 and 820.2. Section 845 provides: "Neither a public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." This section does not offer the broad immunity urged by the City. "[T]he immunity provided in section 845 is meant to protect the budgetary and political decisions which are involved in hiring

---

[3]We do not frame our discussion in terms of whether appellant has stated a cause of action for negligent misrepresentation because, as noted, we are limited to those theories of liability raised in the complaint. (Cf. *Garcia* v. *Superior Court* (1990) 50 Cal.3d 728 [268 Cal.Rptr. 779, 789 P.2d 960].) The theory of liability alleged in appellant's complaint was that a duty to warn arose from the special relationship between appellant and the City.

[4]The City cites these statutes as Civil Code section 47, subdivisions (2) and (3). In 1990, this statute was revised and its subdivisions retitled (a), (b), (c), (d), and (e). Those portions of the statute pertinent to this appeal were not altered.

[5]Subsequent statutory references are to the Government Code unless otherwise specified.

and deploying a police force." (*Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792 [221 Cal.Rptr. 840, 710 P.2d 907], internal quotation marks omitted.) Appellant, here, has not pleaded that the City should have created a special force to protect witnesses; rather, he pleaded that the City should have warned him. This required a simple phone call by existing personnel. (See *Leger* v. *Stockton Unified School District, supra,* 202 Cal.App.3d at p. 1463.)

■ Section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his [or her] act or omission where the act or omission was the result of the exercise of the discretion vested in him [or her], whether or not such discretion be abused." In arguing that this section bars this action, the City focuses on Detective Williams's statement to appellant regarding the danger, or lack thereof, posed by Jenkins. The City asserts that Detective Williams exercised his discretion when he determined exactly how much to tell appellant about Jenkins. Such a literal interpretation of "discretionary" is erroneous. (See *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 787-797 [73 Cal.Rptr. 240, 447 P.2d 352].) The immunity codified in this section applies to "areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision." (*Id.,* at p. 794.) "[S]ection 820.2 affords immunity only for '*basic* policy decisions.' [Citations.]" (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 445, italics added by *Tarasoff.*) The choice made by Detective Williams, if any, of what to tell appellant simply is not a ."basic policy decision" and, consequently, is not protected by this section.

### DISPOSITION

The judgment is reversed. Appellant is to recover his costs on appeal.

George, Acting P. J., and Epstein, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 5, 1991.