[No. B045271. Second Dist., Div. Three. Jan. 28, 1993.]

LULA WALLACE, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

COUNSEL

Raymond P. Boucher for Plaintiff and Appellant.

James K. Hahn, City Attorney, Thomas C. Hokinson and Richard M. Helgeson, Assistant City Attorneys, for Defendants and Respondents.

OPINION

CROSKEY, J.—Plaintiff Lula Wallace (plaintiff) appeals from a judgment of nonsuit entered in her action against defendants the City of Los Angeles (the City) and Detective Donald Richards (Detective Richards). Detective Richards is a member of the City's police department. The sole cause of

action alleged against defendants was for the negligent wrongful death of plaintiff's 18-year-old daughter, Demetria Wallace (Demetria). Demetria was shot and killed days before she was to give testimony as a witness for the prosecution at a preliminary hearing in a murder case. In granting the defendants' motion for nonsuit, the trial court ruled that defendants had no duty to protect Demetria in any manner after Demetria agreed to be a prosecution witness.

This is a conclusion which we firmly reject. Based on the evidence produced at trial, we find that defendants did owe Demetria a duty of care in their relationship with her. We further find that defendants have no governmental immunity from liability to plaintiff. Therefore the judgment of nonsuit must be reversed.

### PROCEDURAL BACKGROUND

Plaintiff filed this action on January 2, 1985. Jury trial commenced July 3, 1989. After the completion of the evidence and both parties had rested, defendants moved for a judgment of nonsuit. That motion was granted and the case was taken away from the jury. An order of dismissal was filed July 10, 1989. After plaintiff's motion for a new trial was denied, she then filed this timely appeal.

### FACTUAL BACKGROUND

The story behind this action commenced when Demetria (a high school honors graduate and a student at Los Angeles City College studying to become a California Highway Patrol Officer) and her boyfriend decided to be good citizens and report a crime to the police after they discovered the lifeless body of cab driver Kimbrough Foley (Foley). Demetria's subsequent "good citizen" decisions cost her life. As the trial court disposed of plaintiff's case by granting a nonsuit, we review in some detail the evidence that the court found insufficient to support a prima facie claim.

### 1. *Detective Richards's Testimony*

Defendant Detective Richards testified as plaintiff's witness under Evidence Code section 776. He stated he had been with the Los Angeles Police Department since December 1970 and, on May 26, 1983, he was working as a detective. At approximately 10:30 p.m. on that day, he was called to investigate a homicide that occurred in an alley near the intersection of Vermont and Vernon in the City of Los Angeles.

Upon arriving at the crime scene, he spoke with Demetria and her boyfriend, Dennis McQuarie. According to detective Richards, Demetria and

McQuarie were in the dental repair office where McQuarie worked when they heard two gunshots in the alley around 9:30 p.m. About five or ten minutes later they decided to leave the office; they exited out the rear door. That door leads into the above mentioned alley. They saw a car in the office's parking lot which should not have been there. McQuarie looked into the car but could not see anything. He obtained a flashlight and shining it into the car, he saw Foley's body. At that point McQuarie telephoned the police and Demetria waited at the rear door.

Detective Richards interviewed a third person who had heard the gun-shots, Anthony Flowers. Mr. Flowers's backyard abuts the alley, and he was in that yard when the shots were fired. He saw a Black male, approximately six feet tall, running in the alley. When shown a photo display folder, Flowers tentatively identified an Anthony Harris as the person he had seen running in the alley. Harris was investigated for a connection to the Foley murder.

Carl Slaughter worked with victim Foley. Slaughter told Detective Rich-ards that on the night Foley was murdered, Foley took a call to go to 950 West 48th Street. A paper in Foley's cab confirmed that that address was Foley's last taxi call. Detective Richards testified that Slaughter described the house on West 48th Street as a "dope pad." This house was directly across the street from where plaintiff and Demetria lived. Working with the narcotics division of the police department, Detective Richards got a list of people who had been arrested at the "rock house." A person by the name of Grant Christon was on that list. Christon fit the description given by Mr. Flowers of the person he saw running down the alley on the night Foley was killed. So did two other males on the list. The three men became possible suspects in the Foley murder case. Later, one of the residents of the rock house told Detective Richards that Grant Christon was present at the house on May 26, 1983, the day Foley was murdered. Christon did not actually live at that house.

On July 13, 1983, Detective Hudson took an anonymous phone call from a male. The caller stated that Grant Christon was the person who murdered Foley and that Christon had been involved in past violent crimes. The caller stated he would not come forward unless prosecution of Christon was assured. Detective Hudson gave this information to Detective Richards. Two days later, Detective Richards spoke with Detective Crostley who told him that he (Crostley) considered Christon a possible suspect in another murder case. Additionally, Crostley told Detective Richards that another detective had gotten an arrest warrant for Christon for yet another murder; the victim in that murder was named Lamont Norwood.

Grant Christon was stopped in his vehicle on August 5, 1983, for violating the Vehicle Code. During the stop the officers discovered he was carrying a .38 Smith and Wesson handgun. Detective Richards was told about the arrest. Knowing that Foley had been killed with a .38-caliber handgun, Detective Richards obtained the gun taken from Grant Christon and the three bullets recovered from the Foley murder to see if they had been fired from that gun. The ballistics comparisons showed that those three bullets were fired from the gun taken from Christon. However, the gun was a stolen gun and the true owner of the gun was sure it had still been in his possession at the time Foley was murdered. Thus, at that point in time, the district attorney's office was not willing to file charges against Grant Christon for the murder of Foley. The deputy district attorney handling the matter felt there was insufficient evidence against Christon and the case needed further investigation.

On August 29, 1983, Detective Richards went to plaintiff's home to question Demetria. He talked to her about an hour. Two police officers were with him. According to Detective Richards, none of Demetria's family was home at that time. He testified that Demetria told him that on the night of Mr. Foley's murder, when her boyfriend was calling the police and she was waiting at the back door, she saw Grant Christon walking in the alley. He stopped and looked at Foley's car for about five seconds. A chain link fence separated Christon from the car. Then Christon left the scene. Demetria recognized Christon because she had gone to school with him.

Based on the information she gave him, Detective Richards wrote out a statement for Demetria and she signed it. After she signed the statement, Detective Richards told Demetria that she would probably be a witness in a case against Grant Christon. He also told her about a witness protection program and how if a witness is threatened, the witness will be relocated. Detective Richards testified that at that point in time, he did not consider Grant Christon to be a danger to the community but if he had so considered Christon, he would have informed Demetria because of her position as potential witness in a future case against Christon. Detective Richards stated he did not tell Demetria that Grant Christon was a suspect in two other murders. Nor did he tell her that Christon had been threatening witnesses in other murder investigations; but he stated he would have told her about Christon's threats to any other witnesses if he had known about such threats because he would have felt obligated to help protect her from any potential harm. Evidence produced by plaintiff later in the trial called into question the veracity of Detective Richards's assertion that he did not know Grant Christon had been threatening witnesses and did not believe Christon was a danger to the community.

On August 31, 1983, two days after Detective Richards spoke with Demetria at her home, Grant Christon was arrested for the murder of Foley. The district attorney filed charges the next day. (At some point in time, Christon was also arrested for the murder of Lamont Norwood.)

On September 15, 1983, Detective Richards was informed that an anonymous caller had telephoned plaintiff's home that day to say that if Demetria testified regarding Grant Christon, plaintiff's home would be blown up. Detective Richards testified that he called plaintiff and advised her to contact him if the threats continued and he "would take action to relocate [Demetria]."[1] Detective Richards testified he did not recall plaintiff being upset about the threat when he talked to her. After he spoke with plaintiff about the threat, he called Grant Christon's attorney to tell him about it so that the attorney could get Christon to stop the threats. Detective Richards believed that the threat was coming from Christon or from Christon's family or friends. Christon was in jail on the day the threat was made to plaintiff.

When speaking with plaintiff about the threatening call, Detective Richards did not tell plaintiff that Grant Christon was a suspect in two other murders. Nor did he tell her that Christon had been threatening witnesses in the cases against him. When asked why he did not relay this information to plaintiff, Detective Richards testified that at the time he was speaking to plaintiff (Sept. 15, 1983), he did not know that Christon had threatened any other witnesses. However, at that point in his testimony, Detective Richards was confronted with a form he had filled out for the district attorney on September 1, 1983, just three days after he had questioned Demetria at her home. In that form (an arraignment information sheet on Grant Christon for the Foley murder charges), Detective Richards had stated: "Detectives have received information that since the defendant has bailed out of jail [on the Norwood murder charges] he is allegedly approaching unknown citizens and stating he is going to get the people who are witnesses against him." Detective Richards testified he got this information regarding Christon's other threats from the police file on the Lamont Norwood murder case. He also testified that he knew the name of one of the persons threatened.

Additionally, on this arraignment information sheet Detective Richards had stated that Grant Christon was carrying a .45-caliber handgun since his

---

[1]At trial, Detective Richards stated that he considered the warning that plaintiff's home would be blown up to be "more a harassment of the Wallace family than an actual threat made to Demetria Wallace at that time." However, he admitted that in his log, he had characterized the phone call as a threat and another officer, in writing about the call, called it a threat. Additionally, at trial Detective Richards acknowledged that he had told Detective Mize and Lieutenant Freia that he actually offered plaintiff and Demetria witness protection in light of this September 15, 1983, threat.

arrest and that Christon was a "definite danger" to the community and especially to any witnesses who might testify against him in court. Detective Richards acknowledged that he did not provide plaintiff with any of this information when he talked to her on September 15 regarding the anonymous phone threat received at her home. When asked about his prior use of the witness protection program, Detective Richards testified he had used it on a number of occasions, including when a witness was threatened.

According to Detective Richards, the preliminary hearing in the Foley murder case against Christon was originally scheduled for September 16, 1983. Demetria had been subpoenaed to appear at that hearing, as had Demetria's boyfriend, persons from the taxi company that Foley worked for and experts regarding the firearm tests. Detective Richards called Demetria to tell her that the hearing was continued to November 7, 1983, and she was again served with a subpoena to appear. Demetria never got to testify; she was murdered on November 2, 1983, as she stood waiting for a bus.[2]

### 2. *Plaintiff's Testimony*

Plaintiff testified that on the morning of September 15, 1983, she received a phone call at her home from a male caller who asked for Demetria. Plaintiff told the caller Demetria was at school and the caller said: "Listen, your daughter has no business opening up her G. D. mouth and if she shows up down here today I'm going to blow her god damn head off and . . . I know where she goes, when she goes, and I also know where you go." Plaintiff stated the caller also threatened to blow up plaintiff's house. Plaintiff's daughter, Yolanda, was home at that time and the two agreed the police should be called. Plaintiff made the call. She could not remember to whom she spoke.

Later that day, Demetria told plaintiff about what she had seen in the alley and about talking to the police. Demetria gave plaintiff Detective Richards's phone number, and plaintiff called him and told him about the threatening call she received.

Plaintiff testified that Detective Richards repeatedly told her to calm down and told her that Demetria really didn't need to testify because he had 12 other eyewitnesses. Plaintiff told Detective Richards that Demetria would not come to testify and Detective Richards told plaintiff that if he felt

---

[2]As of the time of trial in the instant case, no one had been convicted for murdering Demetria. The officer who investigated her murder testified he did not feel he had sufficient evidence to have murder charges filed against anyone. Grant Christon was in jail on the day Demetria was murdered.

Demetria was in any kind of danger he would tell plaintiff. Detective Richards told plaintiff Demetria did not have to change her daily routine nor did anyone else at the house and he would stake his life on it. Detective Richards told her there was no need for protection because Grant Christon was behind bars where he would stay and he was "going to fry."[3] Plaintiff testified the call she made to Detective Richards lasted about 30 minutes; Detective Richards had earlier testified that it lasted less than 5 minutes.

Plaintiff testified that Detective Richards told her if he felt Demetria was in any danger he would have her removed from plaintiff's home and hidden from everyone except plaintiff. Based on all of Detective Richards's representations to her, plaintiff and Demetria refrained from taking precautions that they would have otherwise taken, such as having Demetria go live with her father or aunts. Plaintiff stated that before Demetria was killed, Detective Richards came to her home with a subpoena for Demetria and she (plaintiff) did not want to accept it. Detective Richards again told her that he had other witnesses and did not need Demetria and that Grant Christon was behind bars and plaintiff and her family should consider themselves safe. (Detective Richards had already testified at trial that Demetria's subpoena was mailed to her and he did not bring it to her. However, he had also testified at his deposition that he took the subpoena for the November 1983 hearing to Demetria's home.) Plaintiff acknowledged that Detective Richards did not tell her he would advise her of anything in the future and further acknowledged that Demetria had never told her she did not want to testify. Plaintiff stated she felt more secure after talking to Detective Richards and knowing that Demetria did not have to testify. She stated Demetria did take precautions for awhile, staying inside the house more often.

A month or two after Demetria was killed, the police offered protection to plaintiff and her daughters in the form of relocation. Later the police told plaintiff they did not have the personnel to find a place for plaintiff and her children to stay and only had enough money to pay for six months of relocation. Plaintiff did not accept the "offer" because she did not have the

---

[3]Detective Richards had already testified at trial that (1) plaintiff was not upset when he spoke with her, (2) plaintiff did not indicate to him she was afraid to have Demetria testify, and (3) plaintiff did not indicate to him Demetria would not be allowed to testify. Detective Richards had also testified he had never told plaintiff she had nothing to worry about, never told plaintiff there were 12 other witnesses, never told plaintiff Demetria did not have to change her daily patterns, never told plaintiff that if there was a need to worry he would tell her, and never told plaintiff Grant Christon was going to fry.

finances to do so and because she did not perceive that she and her children were in danger any longer.[4]

### 3. The Sisters' Testimony

Yolanda Wallace, Demetria's sister, testified she was home and in the kitchen the day Detective Richards came with other officers to her home to question Demetria about the Foley murder. The door separating the kitchen from the portion of the house where Demetria and the officers were talking was closed but for a crack; however, through the crack Yolanda could see Demetria sitting in a chair and she could hear her and hear the officers. Yolanda testified the officers told Demetria that they knew it was Grant Christon who was in the alley the night of the Foley murder and who killed Foley, and they asked Demetria what she saw and whether she saw Grant Christon. Yolanda testified that Demetria told the officers she could not say for sure it was Grant that she saw because all she really saw was a shadow. The officers told Demetria they had 12 other witnesses who said it was Grant Christon. Yolanda stated the officers kept trying to get Demetria to say it was Grant Christon that she saw but Demetria kept telling them she could not say that it was. According to Yolanda, Detective Richards and the officers came to the house about three o'clock in the afternoon and were still there when Yolanda had to leave for work one hour later. She asked one of the officers to move their car because it was blocking hers.

Yolanda and her sister Andrea both testified regarding what plaintiff told them after she finished her phone call with Detective Richards on the night of the day the threatening phone call came to her home. Both daughters testified plaintiff told them Detective Richards told her that neither she nor Demetria had anything to worry about, no harm would come to them, and he would stake his life on it. Andrea and Yolanda stated their mother told them Detective Richards assured her Demetria did not have to alter her daily routine. According to Andrea, Demetria indicated she would follow these assurances and not do anything in particular to ensure her safety. Yolanda testified that once she and Demetria and another sister were talking and they agreed that the person making the threat would have to kill all of the witnesses, not just Demetria.

### 4. The Deputy District Attorney's Testimony

Lynn Reed, a deputy district attorney, testified she worked on two murder cases against Grant Christon. She described Demetria as being the main

---

[4]The case against Grant Christon for the murder of Foley was dropped after Demetria was killed because the district attorney was not able to proceed at the preliminary hearing without her.

witness in the Foley murder case because Demetria's testimony linked Grant Christon to that murder. Demetria's testimony was described by Reed as "essential" and "critical." Reed stated that at one point Demetria had called the district attorney's office because she was concerned about coming to court. One of Reed's investigators told her he would take care of Demetria's call. The investigator was either Detective Richards or another detective. According to Reed, Grant Christon's family had threatened people in other cases. Reed had prosecuted one of the Christon brothers for rape. When asked about the fact that Demetria was to be a witness for the prosecution, Reed stated that "it's relatively rare in these kinds of cases to get people to step forward to testify when they have no personal interests in it themselves other than just being a good citizen."

DISCUSSION

### 1. Standard of Review

■ In an appeal from a judgment of nonsuit, we affirm the judgment if the trial court's stated grounds for granting nonsuit are correct. (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 418, pp. 419-420; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 262, p. 269.) However, we must view the evidence in the light most favorable to the plaintiff. Nonsuits, like directed verdicts, may be granted only when the court has given plaintiff's evidence all the value to which it is legally entitled, including giving it the legitimate inferences which flow from that evidence. (*O'Keefe* v. *South End Rowing Club* (1966) 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]; *Mann* v. *State of California* (1977) 70 Cal.App.3d 773, 776, fn. 1 [139 Cal.Rptr. 82]; 7 Witkin, *supra*, § 409, p. 412.)

### 2. Basis of the Trial Court's Decision

The trial court granted defendants' motion for nonsuit because it found that defendants owed no duty of care to Demetria. ■ The question of whether the facts of a case give rise to the existence of a duty of care " 'is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court.' (Prosser, Torts (4th ed. 1971) § 37, p. 206.)" (*Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937, 941 [196 Cal.Rptr. 301].) If the facts of the case do not show that the defendant had a duty to the plaintiff, the case should not be submitted to the jury. (*O'Keefe* v. *South End Rowing Club, supra,* 64 Cal.2d at p. 746.)

Here, in finding that the defendants had no duty to Demetria, the trial court stated there was no evidence to show that Detective Richards created a

peril and no evidence showing that a special relationship was created between Detective Richards and Demetria. We conclude that the trial court was wrong on both counts.[5]

### 3. *The Duty of Care*

#### a. *Duty to Warn Based on Creation of a Peril*

##### (1) *Background of the Law*

■ "As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if '(a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' (Rest.2d. Torts (1965) § 315; [citations].)" (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].)

■ In applying these "duty to warn" rules to law enforcement officers and other governmental agents, reviewing courts have made it clear that such agents have no duty to the public as a whole to warn that a particular person is a threat to the public's well-being. *However, when the government's actions create a foreseeable peril to a specific foreseeable victim, a duty to warn arises when the danger is not readily discoverable by the endangered person.* Thus, a duty to warn was found in *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], where the California Youth Authority placed a minor in the foster care of the plaintiff and her husband. The minor had homicidal tendencies and a background of cruelty and violence to persons and animals, but the Johnsons were not warned about him. The minor attacked the plaintiff soon after moving into her home.

In contrast, no duty to warn was found in *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701], where a child was killed by a juvenile offender who was prone to violence against young children and who, prior to his release to his mother's care from a county institution, had threatened to kill a young child residing in his mother's neighborhood. The juvenile offender gave no indication of which child he intended as his victim. The defendant county did not warn the local

---

[5]On appeal, defendants assert that both the absence of duty and the presence of statutory immunities prevent plaintiff from recovering against them. We must first address the issue of duty. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 22-23 [192 Cal.Rptr. 233, 664 P.2d 137].)

police nor persons in the mother's neighborhood of these facts. In comparing the case before it with the *Johnson* case, the *Thompson* court stated: "In *Johnson* we emphasized the *relationship* between the state and plaintiff-victim, and the fact that the state by its conduct placed the specific plaintiff in a position of clearly foreseeable danger. In contrast with the situation in *Johnson*, in which the risk of danger focused precisely on plaintiff, here County bore no special and continuous relationship with the specific plaintiffs nor did County knowingly place the specific plaintiffs' decedent into a foreseeably dangerous position. Thus the reasoning of our holding in *Johnson* would not sustain the complaint in this action." (*Id.* at p. 751.)

Likewise, the court in *Davidson v. City of Westminster, supra,* 32 Cal.3d 197, found that the defendants in that case had no duty to warn. In *Davidson,* the plaintiff had been stabbed in a laundromat which the police had under surveillance at the time of the stabbing. Three stabbings had taken place at the same or nearby laundromats and the police had been watching their suspect in the laundromat on the night that plaintiff was stabbed by him. The police knew that the plaintiff was inside the laundromat but did not warn her about their suspect. The *Davidson* court contrasted the case before it with the facts in *Johnson,* emphasizing that in the *Johnson* case, "the state put the parolee in the victim's home and failed to warn of homicidal tendencies; thus the state *placed* the victim in danger. Here the police were in no way responsible for the presence of either the assailant or the victim in the laundromat." (*Id.* at p. 207.)

### (2) *Application of the Law to This Case*

■ Applying *Johnson, Thompson* and *Davidson* to the facts of this case, we conclude that defendants had a duty to warn Demetria about the danger presented by Grant Christon. We draw this conclusion because we find that defendants created a foreseeable peril for Demetria, a peril that was not readily discoverable by her.

To begin with, prior to the time that Demetria signed the witness statement prepared for her by Detective Richards, she was simply one of many people who had been interviewed by the police on the night of the Foley murder and as such, was not someone whom Grant Christon would perceive as a threat to his freedom. But when Detective Richards had Demetria sign the witness statement implicating Grant Christon in the murder of Foley and when Detective Richards determined that Demetria would be offered as a prosecution witness to the district attorney to obtain murder charges against Christon, Demetria's position changed radically. Thereafter, she was in a position of peril. It was a peril not of her own making, for unlike the

laundromat assault victim in *Davidson* who had come to her peril of her own accord and without any instigation by the police, Demetria was pursued by Detective Richards, a person seeking to make a murder case against Grant Christon.[6] Just three days after Demetria signed her statement for Detective Richards, the district attorney filed murder charges against Grant Christon for the murder of Foley; the district attorney had refused to file against Christon prior to receiving Demetria's written statement. Through Detective Richards's police work, Demetria was brought into the zone of danger associated with Grant Christon.

Detective Richards's own testimony showed that there was indeed a zone of danger associated with Christon. At trial, Detective Richards acknowledged that just three days after Demetria signed the witness statement implicating Grant Christon in the murder of Foley, he (Detective Richards) had informed the district attorney's office that (1) police detectives had received information that Christon was threatening to "get" the people who testify against him, (2) Christon was carrying a handgun, and (3) he (Detective Richards), an experienced police detective, personally considered Christon to be a "definite danger" to the community at large *and especially to any witnesses who might testify against him in court.* Additionally, Detective Richards knew that Christon was associated with the dope house across the street from where Demetria lived and also knew that Christon was a Defendant in a second murder case and a suspect in a third. Given all of these facts, a reasonable person could conclude that Demetria was in foreseeable danger because of her position as a witness for the prosecution.

Viewing the other evidence brought out at trial, a reasonable person could also conclude that the danger Demetria was in was not readily discoverable by her. While it is true that Demetria knew that Christon was charged with a violent murder, Demetria could reasonably infer from Detective Richards's conduct on the day he interviewed her that she, at that point in time, did not need to concern herself about Grant Christon being a threat to her. Detective Richards himself testified that he merely described the witness protection program to Demetria; he did not offer to put her in the program at that time. Because he did not offer her protection, Demetria could infer that she did not then need protection. Detective Richards was a person with expertise in such matters; in contrast, there is no evidence that Demetria had experience as a witness in a criminal case or had her own independent knowledge about the witness protection program.

---

[6]We do not find that Demetria placed herself in peril by agreeing to sign the witness statement prepared by Detective Richards or by agreeing to honor the subpoenas served on her. Nor did the *Johnson* court find that by agreeing to foster a parolee from the Youth Authority, the plaintiff in that case placed herself in a position of peril.

When the threatening phone call came to her home, Detective Richards's actions again gave the impression that Demetria was not in danger. He testified he spent less than five minutes on the telephone with plaintiff when he talked to her about that threat. He stated he simply told her to call him if she got any more threats and *then* he would take action to relocate Demetria. Arguably, he gave Demetria and her mother the impression that, at that point in time, Demetria still was not in danger.

When plaintiff's testimony is added to the analysis, there is considerable evidence that Detective Richards gave Demetria and her mother the impression there was no immediate danger. According to plaintiff, Detective Richards told her (1) that if he felt Demetria was in danger, he would tell her and he would remove her from plaintiff's home, (2) that none of the people living in her house needed to change their daily routines, and (3) that there was no need for protection. According to plaintiff, Detective Richards repeated his assurances of safety when he delivered the subpoena for Demetria.

Thus the evidence, viewed in the light most favorable to plaintiff, shows that not only did defendants place Demetria in danger by involving her in the case against Grant Christon, but Detective Richards skewed her appreciation of that danger by what he did and did not tell her and her mother; and this appears to be so even if one only considers what Detective Richards admits to telling Demetria and her mother. Therefore, there was substantial evidence to show that defendants had a duty to warn Demetria about the peril she was in.

b. *Duty of Care Based on Defendants' Request for Demetria's Assistance*

In *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923 [281 Cal.Rptr. 500], a case with facts closely related to those presented here, the court found a duty to warn a witness for the prosecution that his life had been threatened. In that case, the witness, George Carpenter, was robbed at gun point by a Daniel Jenkins. Jenkins fired twice but did not physically injure Carpenter. Carpenter gave Detective Williams, of the North Hollywood division of the Los Angeles Police Department, a description of Jenkins and picked Jenkins out of a photo lineup. Carpenter testified at Jenkins's preliminary hearing, identifying Jenkins as the robber. After the hearing, Jenkins spoke to Carpenter, saying "Why did you lie? I didn't do anything to you. God punishes people who lie." Carpenter responded: "God also punishes people who shoot at others and rob them."

Because of his courthouse encounter with Jenkins, Carpenter was concerned about his safety and asked Detective Williams about Jenkins's criminal history and whether Carpenter had cause to be concerned about his

welfare. Williams replied that Carpenter had nothing to worry about because Jenkins was just "a street punk" who was "basically into" grand theft auto and small robberies. Carpenter, relying on this assurance from Williams, took no steps to protect himself and he did not request protection from the police or the district attorney's office.

Sometime before trial, a sergeant at the Wilshire division of the police department got word from a reliable informant that Jenkins had tried to hire him to kill Carpenter. Jenkins told the informant that he was aware of Carpenter's personal daily routine, having tailed Carpenter. The sergeant relayed this information to Detective Slack at the Wilshire Station who in turn relayed it to Detective Riscen at the North Hollywood police station.

Two months later, Carpenter was shot by an unknown assailant before he could testify at trial. Detective Williams had never offered to provide Carpenter with any type of protection. After the shooting, Carpenter was placed in a witness protection program and sent out of state. Carpenter was not informed of Jenkins's attempt to hire the reliable informant to kill him until Carpenter returned eight months later to testify in the preliminary hearing of a murder case against Jenkins. The victim of that murder was Detective Williams, and Jenkins was convicted of killing him. The *Carpenter* court found that the City owed a duty of care to Carpenter. (*Carpenter* v. *City of Los Angeles, supra,* 230 Cal.App.3d at p. 933.) In arriving at that conclusion, the court found *Walker* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1393 [238 Cal.Rptr. 146] persuasive.

In *Walker,* the plaintiff was injured while trying to capture a roaming dog. A county animal control officer had requested that plaintiff capture the stray dog after the officer had been unable to do so herself. Plaintiff was seriously injured during his attempt to secure the dog. In describing the issue before it, the *Walker* court stated: "The central question in this case is whether a 'special relationship' is created when a public employee asks a private citizen to assist the employee in performance of a public function which involves a foreseeable risk of injury." (*Walker* v. *County of Los Angeles, supra,* 192 Cal.App.3d at p. 1399.) The court answered the question in the affirmative, finding a special relationship which gives rise to a duty of care toward the private citizen whose help is enlisted. (*Id.* at pp. 1402, 1403, fn. 8.)

There can be little doubt that *Carpenter* and *Walker* support plaintiff's assertion that there existed between Demetria and defendants a special relationship such that defendants owed Demetria a duty of care. The evidence showed that defendants enlisted Demetria to be a prosecution witness

in the case against Grant Christon, and the evidence also showed that Demetria's role as prosecution witness carried with it a foreseeable risk of harm to her. Thus, the *Walker/Carpenter* test is met here.[7]

Nevertheless, defendants argue that *Carpenter* is of no assistance to plaintiff because in that case, the victim-witness was not informed by the police that Jenkins had attempted to hire a hit man to kill him, whereas here, Demetria was aware of the threatening phone call made to her home. We, however, see little difference in impact between the facts of *Carpenter*, where the police did not inform Mr. Carpenter that Jenkins wanted to have him killed, and the facts of the case before us, where Detective Richards diluted the importance of the threatening phone call by what he said to plaintiff about it. In both cases, the prosecution witness was lulled into a false sense of security. In *Carpenter*, the police lulled the witness into a false sense of security when, after telling him he did not need to worry about Jenkins, they then failed to tell him they had new information about the danger Jenkins posed. Here, Demetria was lulled into a false sense of security when Detective Richards (1) minimized the importance of the phone call which plaintiff received, (2) failed to tell Demetria about Grant Christon's other threats, and (3) failed to tell Demetria he considered Christon a threat to the community at large and especially to persons like herself who were tapped to be witnesses against Christon.

c. *Conclusion as to Existence of Duty of Care*

Although the trial court granted defendants' motion for nonsuit because it found they owed no duty of care to Demetria, from the evidence produced at trial it is clear that there are at least two bases for finding that such a duty existed. First, the evidence supports a finding of a duty to warn based on creation of a peril (*Johnson v. State of California, supra,* 69 Cal.2d 782). Second, the evidence supports a finding of a duty of care based on defendants' request for assistance from Demetria (*Carpenter v. City of Los Angeles, supra,* 230 Cal.App.3d 923). Therefore, a judgment of nonsuit was not

---

[7]A finding that defendants owed Demetria a duty of care is not an end in itself; a person having a duty of care towards another may need to carry out that duty in one or more ways. Thus, the *Carpenter* court stated: "Reasonable care required that the police, after lulling [Carpenter] into a false sense of security, inform him of this very real threat. [Citations.] We are speaking here of a duty to warn. As evidenced by the Witness Protection Program in which [Carpenter] was placed after being shot, the City already recognizes it has a duty to protect certain witnesses." (*Carpenter v. City of Los Angeles, supra,* 230 Cal.App.3d at pp. 933-934.)

properly granted on the grounds enunciated by the trial court. We next consider whether defendants have immunity from liability to plaintiff.[8]

### 4. *The Issue of Immunity*

■ According to defendants, Government Code sections 845 and 820.2 both provide them with immunity from liability to plaintiff. However, the law is otherwise.

### a. *Section 845*

Government Code section 845 states in pertinent part: "Neither a public entity nor a public employee is liable for failure to establish a police department or otherwise to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." "This immunity is meant to protect the budgetary and political decisions which are involved in hiring and deploying a police force. (Cal. Law Rev. Commission com. to § 845.)" (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 815 [205 Cal.Rptr. 842, 685 P.2d 1193]; accord *Mann* v. *State of California, supra,* 70 Cal.App.3d at pp. 778-779.) Thus, section 845 was not intended to provide immunity against a particular police officer's negligence in the performance of his duty in a particular situation. (*Mann, supra,* at pp. 778-779.) No budgetary or political decisions are involved therein.

---

[8]Defendants rely on *M.B.* v. *City of San Diego* (1991) 233 Cal.App.3d 699 [284 Cal.Rptr. 555], *Posey* v. *State of California* (1986) 180 Cal.App.3d 836 [225 Cal.Rptr. 830], and *Von Batsch* v. *American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111 [222 Cal.Rptr. 239]. However, these cases are distinguishable from the one before us.

In *M.B.* v. *City of San Diego*, the police took reports from the plaintiff after her house had been burglarized (with personal items stolen), and after she later began receiving obscene phone calls from the thief, who told her he was going to return to her home. On both occasions, the police assured the plaintiff that people like the thief "never come back." However, this thief did return, and he raped the plaintiff. In *Posey*, California Highway Patrol officers observed a car parked on the shoulder of a highway in San Jose. They did not investigate it and two hours later, the car in which the plaintiff was riding collided with the parked car. The plaintiff contended the patrol officers had a duty of care to her to remove the parked car. In *Von Batsch*, police responded to a burglar alarm at a business. They investigated the premises and afterwards told the employees there were no intruders there. Later, plaintiff's decedent came to the business to work and was killed by intruders. Had the police investigated the roof, they would have found holes through which the intruders gained access to the building.

The courts in *Von Batsch*, *Posey* and *M.B.* found that the peace officers involved in those cases had no duty of care to the plaintiffs (or their decedents). The officers had not created the perils in which the injured parties found themselves. Nor had the officers made promises to protect the injured persons, or by their conduct induced the injured persons to detrimentally rely on them for protection (*Mann* v. *State of California, supra,* 70 Cal.App.3d 773).

### b. *Section 820.2*

Government Code section 820.2 states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." If Detective Richards were to have immunity under section 820.2, then under Government Code section 815.2,[9] so would the City. (*Johnson* v. *State of California, supra,* 69 Cal.2d at p. 787.)

However, just as the *Johnson* court found that the state's parole agent did not engage in a discretionary function within the meaning of Government Code section 820.2 when he decided whether he was going to warn the Johnsons about the potentially dangerous propensities of the paroled youth whom he placed in the Johnsons' home, so also here, Detective Richards did not engage in discretionary acts when he (1) minimized the importance of the threatening phone call which plaintiff received, (2) determined at various points in his investigation of the Foley murder that he would not inform Demetria or her mother about Grant Christon's possible involvement in other murders nor inform them about Christon's other threats against witnesses, (3) determined that he would not inform them he considered Christon to be a threat to the community at large and especially to persons who might testify against Christon, and (4) determined that he would not offer protection to Demetria despite what he knew about the phone call and about Christon.

In discussing the efforts of reviewing courts to distinguish between acts of a public employee which can be classified as discretionary (and therefore entitled to immunity under Government Code section 820.2) and those which are merely ministerial and not deserving of immunity, the *Johnson* court said: "Courts and commentators have . . . centered their attention on an assurance of judicial abstention in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government." (*Johnson* v. *State of California, supra,* 69 Cal.2d at p. 793.) The court stated that section 820.2 only seeks to insulate basic policy decisions from liability and the court found that the decision to warn or not warn of foreseeable, latent dangers does not rise to the level of a basic policy decision.[10] (69 Cal.2d at p. 793 et seq.).

*Johnson*'s ruling regarding a defendant's "failure to warn" was affirmed in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131

---

[9] Section 815.2 of the Government Code provides in relevant part: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

[10] The *Johnson* court stated that courts must distinguish between a public employee's discretionary decisions (such as the decision to parole a youth) and that same employee's subsequent ministerial acts which are connected to his discretionary decisions, (such as the act of giving or not giving a warning). The court cited several cases wherein a public

Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] and reaffirmed in *Peterson* v. *San Francisco Community College Dist., supra,* 36 Cal.3d 799. In *Peterson,* the Supreme Court stated: "As we noted in *Tarasoff,* . . . the defendant is not immune from liability pursuant to section 820.2 . . . because the failure to warn does not involve those basic policy decisions which this immunity provision was meant to protect. [Citations.]" (*Peterson, supra,* at p. 815.)

Applying *Johnson, Tarasoff* and *Peterson* to the case before us, we hold that although Detective Richards's decision to offer Demetria to the district attorney as a prosecution witness may have been a discretionary one (we need not decide that here), his subsequent decisions to refrain from warning her about the danger associated with her role of witness and refrain from offering her protection were not. A similar conclusion was reached in *Carpenter* v. *City of Los Angeles, supra,* 230 Cal.App.3d 923, where police also failed to warn a prosecution witness of the danger he was in. The *Carpenter* court relied on *Tarasoff* and *Johnson* and found that an officer's decision not to warn the plaintiff was not a "basic policy decision" and therefore the City of Los Angeles was not entitled to Government Code section 820.2 immunity. (*Carpenter, supra,* at p. 935.)

### 5. *Public Policy Considerations*

Defendants have enumerated a parade of horribles which they contend will surely descend on the criminal justice system if we find they can be held liable to plaintiff for the death of her daughter. In doing so, defendants ignore the fact that the California Supreme Court has already held applicable, to law enforcement and correctional employees, the negligence rules regarding a person's duty to warn of foreseeable, latent perils created by such person. (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197; *Johnson* v. *State of California, supra,* 69 Cal.2d 782.) Further, *Walker* v. *County of Los Angeles, supra,* 192 Cal.App.3d 1393 and *Carpenter* v. *City of Los Angeles, supra,* 230 Cal.App.3d 923, held that public entities and their employees have a duty of care to persons from whom said employees have requested and obtained aid. The *Walker* and *Carpenter* courts stressed the benefit to the public when such aid is rendered. (*Walker, supra,* at p. 1402; *Carpenter, supra,* at p. 933.) Thus, precedent abounds for making defendants account for their actions regarding Demetria.

We find language in *Johnson* v. *State of California, supra,* 69 Cal.2d at pp. 797-798, to be highly relevant here. In addressing the immunity contentions

---

employee's decision was found to be (or assumed to be) discretionary but his subsequent decision regarding whether to warn persons who might be harmed by that discretionary decision was not. (*Johnson* v. *State of California, supra,* 69 Cal.2d at pp. 793-798.)

of the State, the *Johnson* court said: "Since the entire populace of California benefits from the activity of the Youth Authority, it should also share equally the burden of injuries negligently inflicted on individual citizens; suits against the state provide a fair and efficient means to distribute these losses.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"In resisting [our] analysis [regarding Government Code section 820.2 immunity], the state points out that the Youth Authority fulfills the 'important' public service of rehabilitation and invites us to speculate that sanction of tort suits for negligence will impair this rehabilitative effort by encouraging 'either a stand-still in . . . [the] placement operation or at least a timid approach to rehabilitation.' Even if this dubious prediction rests on some basis in fact, however, it cannot serve as a reason for immunity.

"The state's contention finds no support in the cases or in the 1963 codification of immunity law. The Legislature did not isolate the Youth Authority as an agency performing a function too important to risk any judicial surveillance; instead, the Youth Authority, like other agencies, attains immunity for specific types of acts and decisions and not for others. In the absence of a legislative declaration, we cannot say that the Youth Authority performs a function so much more important than that of other state agencies as to warrant total immunity. Indeed, if 'importance' were the criterion, presumably most state services could meet it; immunity would then be the rule rather than the exception, . . . ." (*Johnson, supra,* 69 Cal.2d at pp. 797-798.)

We add our own observations about holding peace officers and their public employers accountable in tort. If we were to hold that an officer can, with impunity, fail to disclose important information to a witness regarding his or her safety, or induce a witness to detrimentally rely on the officer regarding such safety, the number of persons who would henceforth be willing to testify on behalf of the prosecution would most likely fall dramatically. Consequently, so would the number of criminals convicted for their crimes. As the court said in *Carpenter*, "Criminal prosecution would screech to a grinding halt without the assistance of witnesses. [Citation.]" (*Carpenter* v. *City of Los Angeles, supra,* 230 Cal.App.3d at p. 933.)

As our society becomes increasingly violent in its daily human interactions, more and more people are called upon to be witnesses in the prosecution of those causing the violence. Yet, as the number of these potential witnesses grows, so also does the likelihood that they, or their families, will be subjected to violence by the very criminal defendants against whom they

will give testimony. Thus, the old phrase "violence begets violence" takes on a new meaning. The threat to the safety of these witnesses is very real, especially when the defendant has gang or drug trafficking affiliations. Unfortunately, the lack of safeguards for such witnesses is also very real.

Society reaps enormous benefits when a witness's testimony succeeds in getting a criminal off the streets and placed behind bars. Society must be willing to pay for that benefit by affording necessary protection to both the witness *and* his family, for the threat of violence against a witness's family will often silence the witness. Without a continuing and visible public commitment to such protection, it is unrealistic to expect citizens to come forward and provide the information so critical to the successful operation of the criminal justice system. To the extent that government fails to meet this essential responsibility, it cedes control of our cities to the criminals.

If the result which we reach in the case before us brings about a greater level of official concern and action promotive of witness safety, and an appropriate devotion of public resources to that end, the long-term result surely will be an increase in both the effectiveness of the criminal justice system and the level of public confidence in it. The attainment of that result is certainly a public policy goal of very high priority.

### DISPOSITION

The judgment of nonsuit is reversed, and the cause is remanded for further proceedings consistent with the views expressed herein. Costs on appeal to plaintiff.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied March 1, 1993, and respondents' petition for review by the Supreme Court was denied May 27, 1993. Panelli, J., and George, J., were of the opinion that the petition should be granted.