[No. B096698. Second Dist., Div. Seven. Feb. 20, 1996.]

THOMAS FALLS et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
RICARDO SAMANIEGO et al., Real Parties in Interest.

## COUNSEL

De Witt W. Clinton, County Counsel, S. Robert Ambrose, Assistant County Counsel, and Dennis M. Gonzalez, Principal Deputy County Counsel, Manning, Marder & Wolfe, Robert S. Wolfe and Josephine M. Chow for Petitioners.

No appearance for Respondent.

Lang, Hanigan & Carvalho and Timothy R. Hanigan for Real Parties in Interest.

## OPINION

**WOODS (Fred), J.**—Petitioners Dennis Ferris and Thomas Falls are Los Angeles County deputy district attorneys being sued for failing to warn or

protect a witness to a drive-by gang murder. Eight months after testifying at the preliminary hearing and prior to trial, the witness was murdered. His parents, real parties in interest, sued petitioners and others; petitioners moved for summary judgment, asserting immunity; the trial court (Superior Court Commissioner Emilie Elias) denied the motion as to three of four causes of action. This petition for a writ of mandate followed. We grant the writ.

### FACTUAL AND PROCEDURAL BACKGROUND

The material facts are undisputed. We summarize them.

On November 10, 1991, gang members Arthur Melendrez and Joey Salazar borrowed a car from fellow gang member George Nunez. That same afternoon, Luis Lopez was outside the home of an acquaintance, 14-year-old Eduardo Samaniego, when Melendrez and Salazar drove by. The car passenger, Melendrez, shot and killed Luis Lopez. Melendrez and Salazar drove off and promptly returned the car to Nunez who smelled gunpowder in it.

Police arrived at the murder scene, interviewed witnesses, and obtained statements including that of Eduardo Samaniego. He stated he had witnessed the murder and saw Arthur Melendrez shoot Luis Lopez.

Thereafter, the district attorney's office filed a felony complaint charging Melendrez and Salazar with the murder of Luis Lopez.

On or before November 21, 1991, George Nunez learned "that his gang . . . planned to kill him for cooperating with the police." Apparently Nunez informed the police of the threat and requested protection because on November 21, 1991, Deputy District Attorney Dennis Ferris, the prosecutor assigned to prosecute Melendrez and Salazar, filed an ex parte motion in superior court for payment of relocation costs for Nunez.

The preliminary hearing was scheduled for December 5, 1991, and Deputy District Attorney Ferris subpoenaed Eduardo Samaniego and other witnesses for that hearing.

On December 5, 1991, with Deputy District Attorney Ferris engaged, the Melendrez-Salazar preliminary hearing was "handed off" to Deputy District Attorney Thomas Falls. He had had no prior involvement with the case and was unaware of the threat to and relocation of George Nunez.

Before the hearing, Deputy District Attorney Falls met with the investigating officers and then with the witnesses.

At the witness meeting, according to witness Bulmaro Oseguera, "all of the witnesses present [including Eduardo Samaniego] . . . told Mr. Falls that we did not want to testify . . . because we were scared we would be hurt or killed."

Deputy District Attorney Falls "explained the witness relocation procedure in detail to those present"; he "specifically advised . . . every person . . . that if they or any family member were threatened in any way, that the necessary steps to relocate them would be taken"; he asked each witness if he or any member of his family had been threatened or if he had heard of threat rumors at school or from friends; each witness said he had not been threatened and had not heard of any threats; he told each witness "to immediately call the Pomona Police Department if they were threatened or if they became aware of any possible threat"; he made sure each witness and parent, if present, "had the business cards or phone numbers of Detectives Cole, Guenther and the Pomona Police Department"; he informed them "that in the past, other gang member witnesses to gang crimes *had* been injured, killed and threatened in retaliation for testifying" and he also told them[1] he "had never heard of nor had knowledge of any *non-gang member witness* to a gang crime [being] injured or killed in retaliation for testifying in a case against a gang member . . . ." (Italics added.)

Witness Bulmaro Oseguera and, no doubt Eduardo Samaniego, not being gang members and having no ties to a gang, understood, reasonably, the prosecutor's assurances to mean "we were not in any danger and that we had nothing to worry about."

Eduardo Samaniego testified at the preliminary hearing.

After the December 5, 1991, preliminary hearing, Deputy District Attorney Falls had no further involvement with the Melendrez-Salazar case nor any contact with Eduardo Samaniego or his parents.

Deputy District Attorney Ferris never talked to Eduardo Samaniego and talked to Eduardo's parents only *after* Eduardo's death.

On August 17, 1992, eight months after the preliminary hearing and prior to trial, a Melendrez gang member fatally shot Eduardo Samaniego in an alley near his home. There had been no threats to Eduardo or his family.

On February 11, 1993, Eduardo Samaniego's parents, real parties in interest, sued Deputy District Attorneys Ferris and Fall, among others, for

---

[1]There is no dispute about the truthfulness of this statement.

fraud and deceit, negligent misrepresentation, wrongful death, and deprivation of civil rights. (42 U.S.C. § 1983.)

On July 18, 1994, petitioners Ferris and Fall moved for summary judgment.

On August 17, 1995, the trial court granted the motion regarding the civil rights cause of action, but on September 26, 1995, denied the motion as to the other causes of action. As to this denial, petitioners seek a writ of mandate.

## DISCUSSION

 The trial court dealt with issues of duty to warn, special relationship, and immunity. As Justice Kaus observed, courts often confuse these issues. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 202 [185 Cal.Rptr. 252, 649 P.2d 894].) The confusion arises when a court finds that a "special relationship" exists, that a governmental agent has a duty and has breached that duty and " 'which when breached gives rise to governmental liability notwithstanding the discretionary (immunized) character of the tortious act.' " (*Ibid.*) Such courts—in finding "special relationship," duty, and breach—overlook the fact that duty " 'is only a threshold issue, beyond which remain the immunity barriers . . . .' " (*Ibid.*) On attempting to "sort[] out the issues presented" (*id.* at p. 201), the trial court erred.

We believe it helpful to separately discuss these issues: judicial immunity, police officer duty-to-warn/duty-of-care cases, and prosecutor (quasi-judicial) immunity.

### 1. *Judicial immunity*

 " 'Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction . . . . This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." ' " (*Imbler* v. *Pachtman* (1976) 424 U.S. 409, 418, fn. 12 [47 L.Ed.2d 128, 136, 96 S.Ct. 984].)

Judicial immunity "has been the settled doctrine of the English courts for many centuries and has never been denied . . . in the courts of [America]." (*Pearson* v. *Reed* (1935) 6 Cal.App.2d 277, 281 [44 P.2d 592].)

"The decisions of this state uniformly and consistently grant immunity from civil suit to judges in the exercise of their judicial functions." (*Tagliavia* v. *County of Los Angeles* (1980) 112 Cal.App.3d 759, 761 [169 Cal.Rptr. 467].)

Judicial immunity is absolute, not qualified. (*Imbler* v. *Pachtman, supra,* 424 U.S. 409, 418 [47 L.Ed.2d 128, 136]; *Pearson* v. *Reed, supra,* 6 Cal.App.2d 277, 281; *Tagliavia* v. *County of Los Angeles, supra,* 112 Cal.App.3d 759, 761.) "The procedural difference between the absolute and the qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial." (*Imbler* v. *Pachtman, supra,* 424 U.S. at p. 418, fn. 13 [47 L.Ed.2d at p. 137].)

Absolute immunity shields a judge "even if the acts are in excess of the jurisdiction of the judge and are alleged to have been done maliciously and corruptly." (*Tagliavia* v. *County of Los Angeles, supra,* 112 Cal.App.3d at p. 761.)

The rationale for such encompassing immunity has been described this way: " 'Whenever, therefore, the State confers judicial powers upon an individual, it confers them with full immunity from private suits. In effect the State says to the officer that these duties are confided to his judgment; that he is to exercise his judgment fully, freely and without favor and he may exercise it without fear; that the duties concern individuals but they concern more especially the welfare of the State and the peace and happiness of society; that if he shall fail in the faithful discharge of them, he shall be called to account as a criminal, but that in order that he may not be annoyed, disturbed, and impeded in the performance of these high functions, a dissatisfied individual shall not be suffered to call in question his official action in a suit for damages. This is what the State, speaking by the mouth of the common law, says to the judicial officer.' " (*Pearson* v. *Reed, supra,* 6 Cal.App.2d at pp. 281-282, quoting 2 Cooley on Torts (3d ed. 1906) p. 795.)

Judicial immunity shields a municipal court commissioner for falsely imprisoning a party who appeared before him (*Tagliavia* v. *County of Los Angeles, supra,* 112 Cal.App.3d 759) and shields a judge who "signed an ex parte order which authorized and resulted in sterilization of a minor." (*Id.* at p. 761, citing *Stump* v. *Sparkman* (1978) 435 U.S. 349 [55 L.Ed.2d 331, 98 S.Ct. 1099].)

Thus, when exercising judicial functions, a judge who has a duty, breaches that duty, and causes injury—however intentionally, maliciously, and corruptly—*is immune from civil suit.*

## 2. *Police officer duty-to-warn/duty-of-care cases*

At common law a police officer did not have immunity from civil suit. (*Imbler* v. *Pachtman, supra,* 424 U.S. 409, 430 [47 L.Ed.2d 128, 143].) He had only a "good-faith defense." (*Ibid.; Randle* v. *City and County of San Francisco* (1986) 186 Cal.App.3d 449, 459 [230 Cal.Rptr. 901].) Statutes now confer immunity that *may* apply to police officer conduct. (E.g., Gov. Code, §§ 820.2,[2] 821.6.[3])

■ "As a general rule, [a police officer like an ordinary citizen] owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.'" (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197, 203, quoting Rest.2d. Torts (1965) § 315.)

Several decisions assess police officer "special relation" and duty to warn. They are not necessarily consistent.

In *Davidson* two police officers staked out a laundromat because women had been stabbed in that or nearby laundromats on three prior occasions. The evening before, officers had surveilled the same laundromat when a woman was stabbed and the police chased but failed to catch the suspect.

After about an hour of surveillance the two officers saw a man whom they identified "as the likely perpetrator" of the prior evening's laundromat assault. During a 15-minute period they saw him repeatedly enter and leave the laundromat. Throughout their surveillance the officers were aware that Yolanda Davidson was inside the laundromat. The officers continued their surveillance and did not warn Yolanda Davidson. Eventually the suspect stabbed her four times. She sued the officers and the city. The trial court sustained their demurrer and Justice Kaus, writing for a unanimous court, affirmed, holding there was no special relationship and no duty of care. (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197, 203.)

Unlike *Davidson,* where there had been no prior contact between the police officers and the victim, in *M.B.* v. *City of San Diego* (1991) 233 Cal.App.3d 699 [284 Cal.Rptr. 555] there was repeated contact.

[2]The section reads: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

[3]The section reads: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

In August 1987, M.B. hired a roofing company to repair her roof. Frank Johnson, a roofing employee, used M.B.'s bathroom and a short time later M.B. noticed lingerie missing. Some days later, while she was sleeping, someone entered M.B.'s bedroom window and stole underwear. She called the police and told Officer Clark she suspected Frank, the roofing employee, had committed the burglary. Officer Clark suggested she buy a stun gun or mace. Police detectives who came to her residence told her " 'not to worry,' that *these guys never come back.*' " (233 Cal.App.3d at p. 702, italics added.)

Soon, Frank "Johnson began making obscene phone calls to M.B. He told M.B. he was the one who had broken into her house *and said he was going to return.*" (233 Cal.App.3d at p. 702, italics added.) Again M.B. called the police and told Detective Torgesen Frank "had said he was going to come over to her house." Detective Torgesen told her " 'they never do.' " (*Id.* at pp. 702-703.)

A short time later the police placed a telephone trap on M.B.'s phone. M.B. considered installing a burglar alarm or moving to a friend's house but did neither "because of the reassurances of the officers." (233 Cal.App.3d at p. 703.)

Two days after the telephone trap was installed, Frank "Johnson returned to M.B.'s home and raped her." (233 Cal.App.3d at p. 703) M.B. sued the city. The city moved for summary judgment and the trial court granted the motion. The Court of Appeal affirmed, holding there was no "special relation" between M.B. and the police and no negligent misrepresentation because police advice was merely "generic." (233 Cal.App.3d at p. 708.)

In contrast to *Davidson* and *M.B.* are *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923 [281 Cal.Rptr. 500] and *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385 [16 Cal.Rptr.2d 113].

In *Carpenter*, a movie theater employee (George Carpenter) was making a 12:45 a.m. deposit of theater receipts when Daniel Jenkins stuck a gun in his face, fired twice, and stole the deposit money. Somehow Carpenter was not injured. He called the police, described what had occurred, and two weeks later identified Jenkins's photograph.

Jenkins was arrested and charged. At a preliminary hearing Carpenter identified him. Afterwards, while Carpenter was sitting in the court hallway talking to the arresting officers, Jenkins approached and said, " 'Why did you lie? . . . God punishes people who lie.' " (*Carpenter* v. *City of Los Angeles, supra,* 230 Cal.App.3d 923, 927.)

Carpenter, now concerned about his safety, contacted the investigating officer, Los Angeles Police Department (LAPD) Detective Williams, asked about Jenkins's criminal history, and whether he "had cause to be concerned." (230 Cal.App.3d at p. 927) Detective Williams said he had nothing to worry about, Jenkins was " 'a street punk' " involved only with auto thefts and small robberies. (*Ibid.*) Carpenter's "concern was somewhat allayed" and he did not request protection. (*Ibid.*) Thereafter, Carpenter spoke to Detective Williams several times about trial subpoenas he had received.

A couple of months later, LAPD Sergeant Pesanti was told by one of his confidential, reliable informants—Sergeant Pesanti had used him 30 to 50 times—that a month before Jenkins had asked him to do a " 'contract hit' on a theater owner in the Valley who had testified against Jenkins in a preliminary hearing." (230 Cal.App.3d at pp. 927-928.) Jenkins had told the informant he knew the target's personal habits and knew he "ate at a pizza restaurant close to the movie theater." (*Id.* at p. 928.)

Sergeant Pesanti conveyed all this information, including the reliability of his informant, to LAPD robbery Detective Slack. Detective Slack found the Jenkins's case number, called the North Hollywood Division, and spoke to robbery Detective Riscen who confirmed the Jenkins's robbery case was being handled by the North Hollywood Division. The two detectives, both familiar with North Hollywood, discussed the theater whose deposit receipts had been stolen.

No one informed George Carpenter about the attempted "contract hit" on his life.

About a month later, still under subpoena to testify at Jenkins's trial, George Carpenter was walking to the Italian restaurant near his theater when an assailant shot him in the head, abdomen, and legs. He survived and was *then* placed in an out-of-state witness protection program.

A few months later, while a jury deliberated Jenkins's robbery of Carpenter, Detective Williams was murdered. Jenkins was charged with his murder.[4] At the preliminary hearing, a year after the attempted "contract hit" on his life, Carpenter learned of the attempted "contract hit."

The trial court granted summary judgment for the city. The Court of Appeal reversed, finding a special relationship, a duty to warn, and a breach of that duty. (230 Cal.App.3d at p. 933.)

*Wallace* is similar. On May 26, 1983, 18-year-old Demetria Wallace and her boyfriend were at his place of work near Vermont and Vernon when,

---

[4]We infer this fact. (See *Carpenter* v. *City of Los Angeles*, *supra*, 230 Cal.App.3d at p. 929.)

about 9:30 p.m., they heard two gunshots. Ten minutes later they left by a rear door adjacent to an alley and saw a parked taxi. Demetria's boyfriend got a flashlight, looked in the taxi, and saw a dead body, the taxicab driver. While her boyfriend phoned the police, Demetria waited by the doorway.

LAPD Detective Richards, the investigating officer, arrived, studied the crime scene, and interviewed witnesses. One witness described seeing a Black male, approximately six feet tall, running in the alley after the gunshots.

Detective Richards's investigation showed that Grant Christon was in the "rock house" from which the victim taxicab driver had picked up his last fare and that Christon fit the description of the person seen running in the alley. Additionally, an anonymous telephone informant said Christon had committed the taxicab murder and had committed other violent crimes. Two days later, Detective Richards learned from another detective there was an outstanding arrest warrant for Christon in connection with the murder of a Lamont Norwood, and Christon was a suspect in a third murder. Later, Detective Richards learned Christon had been arrested August 5, 1983, in possession of a stolen .38-caliber handgun. Detective Richards had the gun tested and determined it was the murder weapon of the taxicab driver. But, complicating the matter, the owner of the .38-caliber handgun said he still possessed it at the time of the taxi driver murder and it was stolen *after* the murder. Although Detective Richards sought murder charges against Christon, the district attorney refused, saying the case needed further investigation.

Detective Richards conducted further investigation when he interviewed Demetria Wallace on August 29, 1983, for an hour at her home. She told him that when she was at the doorway waiting for her boyfriend to call the police ". . . she saw Grant Christon walking in the alley . . . [h]e stopped and looked at [the taxicab] for about five seconds . . . [and] [t]hen Christon left the scene." (*Wallace* v. *City of Los Angeles*, *supra*, 12 Cal.App.4th at p. 1390.) She recognized him because she had gone to school with him.

Detective Richards wrote Demetria's statement and she signed it. He told her about a witness protection and relocation program.

On August 31, 1983, two days after Demetria's statement, Grant Christon was arrested for the murder of the taxicab driver and the next day the district attorney charged him with that murder.

On September 1, 1983, the day the district attorney filed the murder charge, Detective Richards filled out an arraignment information form and

gave it to the district attorney. On the form he stated that since Christon had bailed out on the *Norwood* murder charge Christon had told people he was "going to get the . . . witnesses against him." (12 Cal.App.4th at p. 1391.)

On September 15, 1983, a day before the scheduled preliminary hearing, Demetria's mother received a telephone call at her home from a male caller who asked for Demetria. When told she was at school the caller said, ". . . your daughter has no business opening up her G.D. mouth . . . ." (12 Cal.App.4th at p. 1392.) He threatened to kill Demetria and blow up the Wallace house. (*Ibid.*)

After Demetria came home from school her mother called Detective Richards and told him about the threat. According to Mrs. Wallace, Detective Richards told her to calm down, he had 12 other witnesses, if he thought Demetria was in danger he would tell her, and there was no need for protection because Christon was in jail. (12 Cal.App.4th at pp. 1392-1393.)

The September 16, 1983, preliminary hearing was continued to November 7, 1983, and Demetria was subpoenaed to appear. On November 2, 1983, while she stood waiting for a bus, Demetria was murdered. Her mother brought a wrongful death suit against Detective Richards and his employer, the City of Los Angeles.

The trial court granted defendant's motion for a nonsuit. The Court of Appeal reversed, holding defendants had a duty to warn Demetria about the peril she was in.

 We view the conduct of petitioners[5] as being in sharp contrast to that of the defendants in all four cases,[6] not only *Carpenter* and *Wallace* where there was a duty to warn but *Davidson* and *M.B.* where there was no duty. Nevertheless, we *assume*, without deciding, that petitioners had a special relationship with Eduardo Samaniego, had a duty to warn and care for him, and breached that duty. Accordingly, *unless* petitioners enjoyed quasi-judicial immunity the petition should be denied.

### 3. *Prosecutor (quasi-judicial) immunity*

Almost as venerable as immunity for judges is immunity for prosecutors. *Imbler* v. *Pachtman* states "[t]he first American case to address the question

---

[5]Petitioner Ferris subpoenaed Eduardo Samaniego but did not otherwise communicate with him. Petitioner Ferris also honored a request by a *gang member* witness, who had received death threats, for relocation protection.

Petitioner Falls truthfully assured Eduardo Samaniego that he had never heard of a *non*gang member witness being retaliated against for testifying.

[6]See also *Walker* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1393 [238 Cal.Rptr. 146] where this court found a duty of care when an animal control officer enlisted the aid of a citizen to catch an abandoned dog which bit the citizen.

of a prosecutor's amenability to [a suit for malicious prosecution] was *Griffith* v. *Slinkard*, 146 Ind. 117, 44 N.E. 1001 (1896). The complaint charged that a local prosecutor without probable cause added the plaintiff's name to a grand jury true bill after the grand jurors had refused to indict him, with the result that the plaintiff was arrested and forced to appear in court repeatedly before the charge finally was *nolle prossed*. Despite allegations of malice, the Supreme Court of Indiana dismissed the action on the ground that the prosecutor was absolutely immune." (*Imbler* v. *Pachtman, supra,* 424 U.S. 409, 421 [47 L.Ed.2d 128, 138], fn. omitted.)

The *Griffith* view that prosecutors, like judges, enjoy absolute immunity from certain civil suits became "the clear majority rule." (*Imbler* v. *Pachtman, supra,* 424 U.S. at p. 422 [47 L.Ed.2d at p. 138].)

The United States Supreme Court adopted this rule in 1927. The case involved a federal prosecutor who "maliciously and without probable cause procured plaintiff's grand jury indictment by the willful introduction of false and misleading evidence." (424 U.S. at p. 422 [47 L.Ed.2d at p. 138].) A federal district court dismissed plaintiff's malicious prosecution suit and the Supreme Court affirmed the prosecutor's absolute immunity. (*Yaselli* v. *Goff* (1927) 275 U.S. 503 [72 L.Ed. 395, 48 S.Ct. 155].)

In California the issue was not decided until 1935 when a prosecutor was sued for malicious prosecution and false arrest. Justice Shinn, writing for a unanimous court, stated: "No policy has been declared and maintained more firmly than the one which preserves the independence and freedom of action of judicial and *quasi*-judicial officers acting in official capacity. The exemption runs as to liability for damages resulting from official acts, although they be done without probable cause and with malice." (*Pearson* v. *Reed, supra,* 6 Cal.App.2d 277, 280, italics in original.)

*Pearson* makes clear that when a *quasi*-judicial officer, such as a prosecutor, acts within his official capacity he, like a *judicial* officer, enjoys absolute immunity.

Absolute quasi-judicial immunity has been extended to all of the following: a witness who gave malicious, perjured testimony (*Burns* v. *Reed* (1991) 500 U.S. 478 [114 L.Ed.2d 547, 111 S.Ct. 1934]; *Briscoe* v. *LaHue* (1983) 460 U.S. 325 [75 L.Ed.2d 96, 103 S.Ct. 1108]); a municipal court commissioner who wrongly imprisoned a party (*Tagliavia* v. *County of Los Angeles, supra,* 112 Cal.App.3d 759); a building inspector who instigated a criminal prosecution (*White* v. *Brinkman* (1937) 23 Cal.App.2d 307 [73 P.2d 254]); a department of building and safety inspector who wrongly ordered a plaintiff

to desist operating her business (*Brown* v. *City of Los Angeles* (1968) 267 Cal.App.2d 849 [73 Cal.Rptr. 364]); a probate court investigator (*Fisher* v. *Pickens* (1990) 225 Cal.App.3d 708 [275 Cal.Rptr. 487]); grand jurors (*Turpen* v. *Booth* (1880) 56 Cal. 65); a deputy coroner whose negligent autopsy caused plaintiff to be wrongly charged with his wife's murder (*Stearns* v. *County of Los Angeles* (1969) 275 Cal.App.2d 134 [79 Cal.Rptr. 757]); child care custodians who improperly interviewed children and recommended plaintiffs be charged with molesting them (*McMartin* v. *Children's Institute International* (1989) 212 Cal.App.3d 1393 [261 Cal.Rptr. 437]); social workers who wrongfully removed a child from custody of her parents (*Alicia T.* v. *County of Los Angeles* (1990) 222 Cal.App.3d 869 [271 Cal.Rptr. 513]); a psychologist involved in dispute resolution (*Howard* v. *Drapkin* (1990) 222 Cal.App.3d 843 [271 Cal.Rptr. 893]); social workers who approved a minor's adoption by a person who molested the minor (*Ronald S.* v. *County of San Diego* (1993) 16 Cal.App.4th 887 [20 Cal.Rptr.2d 418]); Department of Social Services employees who drove plaintiffs from their foster care business as part of "a vendetta" (*Gensburg* v. *Miller* (1994) 31 Cal.App.4th 512, 516 [37 Cal.Rptr.2d 97]).

Equally clear is that when a quasi-judicial officer acts *outside* his official capacity he does *not* enjoy immunity. Thus, a prosecutor is not immune when making inflammatory statements at a press conference (*Marx* v. *Gumbinner* (11th Cir. 1988) 855 F.2d 783; *Buckley* v. *Fitzsimmons* (1993) 509 U.S. 259 [125 L.Ed.2d 209, 113 S.Ct. 2606]) or when giving *precharging* advice to the police (*Burns* v. *Reed, supra,* 500 U.S. 478). He may also be without immunity when investigating a crime *before* there is probable cause to arrest or charge a suspect (see *Buckley* v. *Fitzsimmons, supra,* 509 U.S. 259 in which the Supreme Court split five to four on the issue).

A prosecutor acts *within* his official capacity when his conduct is an " 'integral part of the judicial process' " or "intimately associated with the judicial phase of the criminal process." (*Imbler* v. *Pachtman, supra,* 424 U.S. 409, 430 [47 L.Ed.2d 128, 143].) All of the following conduct has been held within the official capacity of a prosecutor and therefore immune: causing the revocation of a defendant's probation (*Taylor* v. *Jones* (1981) 121 Cal.App.3d 885 [175 Cal.Rptr. 678]); during pretrial discovery, revealing the identity of a confidential informant (*Doe* v. *U.S.* (S.D.N.Y. 1993) 829 F.Supp. 59); causing the destruction of evidence by the "release" of a murder crime scene (*Ybarra* v. *Reno Thunderbird Mobile Home Village* (9th Cir. 1984) 723 F.2d 675); seeking a precharging search warrant (*Burns* v. *Reed, supra,* 500 U.S. 478); giving errant advice to a grand jury (*Harmston* v. *Kirk* (1989) 216 Cal.App.3d 1410 [265 Cal.Rptr. 548]); mistakenly freezing the

assets of a nondefendant (*Ehrlich* v. *Giuliani* (4th Cir. 1990) 910 F.2d 1220); participating in a coroner's inquest hearing (*Williams* v. *Hartje* (8th Cir. 1987) 827 F.2d 1203); suppressing exculpatory evidence (*Randle* v. *City and County of San Francisco, supra,* 186 Cal.App.3d 449).

The actions of petitioners consist of subpoenaing a witness for a judicial hearing and interviewing that witness prior to the hearing. Such actions are indivisible from and "intimately associated with" the act of initiating a criminal prosecution—for which a prosecutor has always enjoyed immunity. (*Imbler* v. *Pachtman, supra,* 424 U.S. 409, 421-422 [47 L.Ed.2d 128, 138-139].)

Prosecutions cannot proceed without witnesses and unless subpoenaed there would be no witnesses.

Equally essential to a prosecution are witness interviews. Typically, a prosecutor files a criminal charge based only upon police reports and *without* interviewing witnesses. Of necessity, those reports are incomplete, often inaccurate summaries of what victims, perhaps still traumatized, and witnesses, frequently frightened and not always English fluent, have told harried police officers eager to patrol, not scribe.

A competent prosecutor, like any trial attorney, must interview a prospective witness before deciding whether or not to call her as a witness. The purpose of the interview is not just to ascertain what information the prospective witness may have. The prosecutor must also persuade the witness she should testify to that information *as a witness.* Sometimes that may mean missing school or work, sometimes it may mean enduring an invasion of privacy or humiliating cross-examination. Almost always it means bearing discomfort and stress. And sometimes it means being subject to a risk of harm.

In conducting interviews a prosecutor must be free to address all the concerns of a witness without fear of civil suit. Only absolute quasi-judicial immunity can provide such freedom.

We hold that a prosecutor acts within his official capacity when he subpoenas a witness or prepares for a postcharging hearing, such as a preliminary hearing, by interviewing a witness and encouraging the witness to testify. (See *Buckley* v. *Fitzsimmons, supra,* 509 U.S. 259, 272-273 [125 L.Ed.2d 209, 226] ["We expressly stated [in *Imbler* v. Pachtman] that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the

courtroom,' and are nonetheless entitled to absolute immunity. [Citation] We noted in particular that an out-of-court 'effort to control the presentation of [a] witness' testimony' was entitled to absolute immunity because it was 'fairly within [the prosecutor's] function as an advocate.' . . . We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."]; *McMartin* v. *Children's Institute International*, *supra*, 212 Cal.App.3d 1393 [child care custodians interviewed possible victims of sexual molestation *prior* to charges being filed]; *Fisher* v. *Pickens*, *supra*, 225 Cal.App.3d 708 [probate court investigator interviewed witnesses and gathered evidence in a conservatorship matter]; *Williams* v. *Hartje*, *supra*, 827 F.2d 1203 [in preparation for a coroner's inquest a prosecutor interviewed a jail inmate to discourage his testimony]; *Marx* v. *Gumbinner*, *supra*, 855 F.2d 783 [precharging, a prosecutor interviewed a four-year-old suspected rape victim]; *Howard* v. *Drapkin*, *supra*, 222 Cal.App.3d 843 [in a family law dispute, a psychologist interviewed a spouse for six hours]; *Gensburg* v. *Miller*, *supra*, 31 Cal.App.4th 512, 523 [" '[A]bsolute prosecutorial immunity attaches to the actions of a prosecutor if those actions were performed as part of the prosecutor's preparation of his case . . . . [¶] 'Preparing to initiate a prosecution may necessitate obtaining, reviewing and evaluating evidence; absolute immunity may attach when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.' "].) Accordingly, a prosecutor enjoys absolute immunity from civil suit for such conduct.

DISPOSITION

The petition is granted. A writ of mandate shall issue directing the superior court to vacate its order denying petitioners' summary judgment motion and enter a new order granting the motion.

Lillie, P. J., and Johnson, J., concurred.