[No. B087779. Second Dist., Div. Four. Oct. 8, 1996.]

MARIA HERNANDEZ, Plaintiff and Appellant, v.
CITY OF POMONA et al., Defendants and Respondents.

COUNSEL

Lang, Hanigan & Carvalho and Timothy R. Hanigan for Plaintiff and Appellant.

Franscell, Strickland, Roberts & Lawrence, Martin J. De Vries, Chase, Rotchford, Drukker & Bogust and Clay Robbins III for Defendants and Respondents.

OPINION

VOGEL (C. S.), P. J.—

## INTRODUCTION

Plaintiff and appellant Maria Hernandez appeals from the dismissal[1] of her complaint for wrongful death after demurrers were sustained without leave to amend on behalf of defendants and respondents, the County of Los Angeles, the City of Pomona, and Officers Gregg Guenther and Raul Camargo (collectively the City of Pomona defendants).[2] We affirm the trial court's ruling that, under the circumstances alleged by plaintiff, respondents owed no duty to protect plaintiff's deceased son from retaliation by fellow gang members against whom he provided incriminating evidence.

---

[1] An order of dismissal was filed regarding the allegations stated against the City of Pomona and Officers Guenther and Camargo, from which the plaintiff properly appeals. However, an order of dismissal was not filed regarding the allegations against the County of Los Angeles and, therefore, the appeal as to it is not taken from an appealable order. For the sake of judicial economy, we will consider the merits of the appeal as if taken from a properly appealable order. As discussed below, we hold that the plaintiff could not have stated a cause of action against the county, even if given leave to amend.

[2] Deputy District Attorney Dennis E. Ferris was named as a defendant, but was never served in this action.

## Factual and Procedural Background

The allegations as stated in the operative second amended complaint are as follows. In the spring of 1991, one Mildred Damper was fatally shot. In the course of investigating the murder, the City of Pomona determined that members of the Happy Town gang may have been involved. Plaintiff's 16-year-old son, Moises Torrez, was affiliated with the Happy Town gang.

Detectives Gregg Guenther and Raul Camargo of the Pomona Police Department went to plaintiff's home several times to speak to Torrez about the murder. Torrez was later taken in by the police for questioning. At that time, both plaintiff and Torrez told the police officers that Torrez did not want to be questioned about the murder because he feared retaliation by members of the Happy Town gang. The detectives allegedly *assured* plaintiff and Torrez that they were only going to question Torrez, and that no harm would come to him as a result of being questioned.[3] Plaintiff alleged that it was well known by defendants that gang members retaliate against witnesses, especially fellow gang members, who testify against other gang members. However, as a result of pressure from the police officers, Torrez gave them a statement implicating fellow gang member Enrique Hernandez in the murder of Mildred Damper.

Torrez was compelled by subpoena to appear at trial on October 12, 1992. When called to testify, he refused to respond to questions and stonewalled the prosecution's examination by asserting his United States Constitution Fifth Amendment privilege. The prosecutor, Deputy District Attorney Dennis Ferris, read to the jury the statement previously given by Torrez to the police. Plaintiff alleged that in doing so, Ferris knew that he was endangering Torrez's life by implicating Enrique Hernandez in the murder of Mildred Damper, thus placing Torrez in harm's way.

One week later, Torrez was killed by fellow gang members for having implicated Enrique Hernandez in the murder.

Thereafter, plaintiff filed the present action, alleging causes of action for wrongful death and deprivation of civil rights pursuant to 42 United States Code section 1983. After defendants demurred to the complaint, plaintiff filed a first amended complaint, alleging only a cause of action for wrongful death.

---

[3]The first amended complaint alleges in part, "These [police] officials assured plaintiff that they were only going to question the Deceased, and that no harm would come to the Deceased as a result of his being questioned." The concurring opinion characterizes the alleged "assurance" as a "guarantee" and from there chastises the prosecutor. We do not read the pleading the same way and do not equate an "assurance" with a "guarantee." We do not, however, take issue with Judge Aranda's expressed concern for the safety of witnesses.

The City of Pomona and the County of Los Angeles then filed their respective demurrers to the first amended complaint. Plaintiff filed opposition only to the demurrer of the City of Pomona defendants. Hearing on the demurrer took place on March 8, 1994, after which the trial court sustained it with leave to amend. Notice was filed March 14, 1994.

The plaintiff filed a second amended complaint on April 7, 1994, again attempting to state a cause of action for wrongful death against the City of Pomona defendants, the County of Los Angeles, and Deputy District Attorney Ferris.

Hearing on the demurrer filed by the County of Los Angeles to the first amended complaint, which had not been placed off calendar,[4] occurred on April 15, 1994. No appearance was made on behalf of the plaintiff. The court sustained the demurrer without leave to amend. Notice was filed on April 28, 1994.

The City of Pomona defendants then filed a demurrer to the second amended complaint, to which plaintiff filed opposition. After a brief hearing on the matter, the demurrer was sustained without leave to amend. An order of dismissal as against the City of Pomona defendants was filed on August 16, 1994, and this appeal ensued.

### STANDARD OF REVIEW

■  A demurrer tests the legal sufficiency of the complaint, and the granting of leave to amend involves the trial court's discretion. Therefore, an appellate court employs two separate standards of review on appeal. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Cantu* v. *Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879 [6 Cal.Rptr.2d 151].) First, the complaint is reviewed de novo to determine whether it contains sufficient facts to state a cause of action. (*Hill* v. *Miller* (1966) 64 Cal.2d 757, 759 [51 Cal.Rptr. 689, 415 P.2d 33].) In doing so, we accept as true the properly pleaded material factual allegations of the complaint, together with facts that may be properly judicially noticed. Reversible error exists only if facts were alleged showing entitlement to relief under any possible legal theory. (*Crowley* v. *Katleman* (1994) 8 Cal.4th 666, 672 [34 Cal.Rptr.2d 386, 881 P.2d 1083]; *Blank* v. *Kirwan, supra,* 39 Cal.3d at p. 318; *Platt* v. *Coldwell Banker Residential Real Estate Services* (1990) 217 Cal.App.3d 1439, 1444 [266 Cal.Rptr. 601].)

Second, where the demurrer is sustained without leave to amend, reviewing courts determine whether the trial court abused its discretion in doing so.

---

[4]The record does not indicate that the plaintiff requested that the demurrer be taken off calendar.

(*Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 781 [180 Cal.Rptr. 657, 640 P.2d 793]; *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406].) On review of the trial court's refusal to grant leave to amend, we will only reverse for abuse of discretion if we determine there is a reasonable possibility the pleading can be cured by amendment. Otherwise, the trial court's decision will be affirmed for lack of abuse. (*Hendy* v. *Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1]; *First Nationwide Savings* v. *Perry* (1992) 11 Cal.App.4th 1657, 1662 [15 Cal.Rptr.2d 173].)

## DISCUSSION

■ The heart of plaintiff's case is summarized in her pleading: "Defendants . . . negligently and/or intentionally breached [their] duties by placing the Deceased in a position of great danger and not offering and/or providing protection to him." The plaintiff contends that the defendants had a duty to protect her son from the risk of retaliation by his fellow gang members which arose when the incriminatory statement given by him was used at trial. ■ In determining whether such a duty exists, as many courts have done before us, "we bear in mind that legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d].) " 'The assertion that liability must . . . be denied because defendant bears no "duty" to plaintiff "begs the essential question— whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . [Duty] is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts [3d ed. 1964] at pp. 332-333.)' " (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 434, quoting *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

■ "In considering whether one owes another a duty of care, several factors must be weighed including among others: ' "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 . . . .) When public agencies are involved, additional elements include "the extent of [the agency's] powers, the role imposed

upon it by law and the limitations imposed upon it by budget; . . ." (*Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 . . . ; see *Smith* v. *Alameda County Social Services Agency* [1979] 90 Cal.App.3d 929 . . . .)' *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 . . . .)" (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 [205 Cal.Rptr. 842, 685 P.2d 1193].)

■ It is by now well recognized that "[a]s a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if '(a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' (Rest.2d. Torts (1965) § 315; [citations].)" (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; see also *Weissich* v. *County of Marin* (1990) 224 Cal.App.3d 1069, 1076 [274 Cal.Rptr. 342].)

■ The plaintiff asserts that a special relationship existed between the defendants and Torrez, by virtue of the fact that he was compelled to give a statement incriminating a fellow gang member, which statement was later used at trial, despite Torrez's expressed fear of retaliation. In support of plaintiff's contention she relies on inapposite authorities which are distinguishable on their facts and holdings.

*Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385 [16 Cal.Rptr.2d 113] was an action for wrongful death brought by the mother of 18-year-old Demetria Wallace, who was killed just before she was to testify as a prosecution witness in a murder case. Initially, police had questioned Demetria, who then gave a Detective Richards a signed statement regarding what she saw on the night of the murder, which statement implicated one Grant Christon. After she signed the statement, Detective Richards told Demetria she would probably be used as a witness in a case against Christon, and told her about a witness protection program through which witnesses would be relocated if they were threatened. (*Id.* at p. 1390.)

Shortly thereafter, someone telephoned Demetria's home and spoke to the plaintiff, Demetria's mother, threatening to blow up her home if Demetria testified. Detective Richards was informed of the threat. He told Demetria to contact him if the threats continued and he would then take action to relocate her. He did not, however, tell her that Christon was a known suspect in two other murders, nor that Christon had been threatening witnesses in the cases against him. In an arraignment information sheet on Grant Christon, Richards had stated that Christon was a "definite danger" to the community; and

especially to any witnesses who might testify against him in court. (12 Cal.App.4th at pp. 1391-1392.)

However, plaintiff testified that when she spoke with Detective Richards about the threat, he told her that Demetria did not really need to testify because he had 12 other eyewitnesses, that if he felt Demetria was in any kind of danger he would tell plaintiff and would hide Demetria from everyone except plaintiff, that Demetria did not have to change her daily routine, and that there was no need for protection because Christon was behind bars, where he would stay. Plaintiff further testified that she and Demetria did not take any precautions, such as having Demetria live elsewhere, based on Detective Richards's reassurances. (12 Cal.App.4th at pp. 1392-1393.) Demetria was murdered while waiting for a bus, five days before she was to testify at a preliminary hearing in the murder case against Christon. (*Id.* at p. 1392.) The case against Christon was subsequently dropped because the district attorney was not able to proceed at the preliminary hearing without Demetria. (*Id.* at p. 1394, fn. 4.)

On appeal, the court reversed the judgment for nonsuit , rejecting the trial court's ruling that no duty existed and finding applicable the principle that *"when the government's actions create a foreseeable peril to a specific foreseeable victim, a duty to warn arises when the danger is not readily discoverable by the endangered person."* (*Wallace* v. *City of Los Angeles, supra,* 12 Cal.App.4th at p. 1396, italics in original.) In concluding that the defendants had a duty to warn Demetria about the danger presented by Christon, the court found that the evidence showed there was a "zone of danger associated with Christon," into which Demetria was placed by the defendants' actions. (*Id.* at p. 1398.) The court further found that the danger was not readily discoverable by Demetria, particularly given Detective Richards's conduct which led her to believe she was not in danger.

Similarly, in *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923 [281 Cal.Rptr. 500], George Carpenter, the victim of a robbery, testified at a preliminary hearing against one Daniel Jenkins. After the hearing, Jenkins accosted Carpenter in the hallway, warning him that "God punishes people who lie." (*Id.* at p. 927.) Concerned for his safety, Carpenter told the detective involved in the case, a Detective Williams, about the encounter. Williams assured him there was no need to worry, that Jenkins was just a "street punk."

Thereafter, a detective in the Wilshire division told a Detective Riscen of the North Hollywood robbery division, of which Detective Williams also was a member, that a reliable informant had reported that Jenkins had tried

to hire the informant to do a "contract hit" on a theater owner in the valley who had testified against Jenkins in a preliminary hearing.[5] Detective Riscen identified Carpenter as being the theater manager involved in Jenkins's criminal case.

However, Carpenter was not told of Jenkins's attempt to put a contract hit on his life. Before he could testify against Jenkins in the robbery case, Carpenter was shot by an unknown assailant. He survived and was then placed in a witness protection program and moved out of state.[6]

The court in *Carpenter* reversed the grant of summary judgment in favor of the defendant city, holding that considerations of policy mandated a finding that a duty of care was owed to Carpenter such that the city should have warned him about Jenkins's threat to his life. Specifically, the court stated that ". . . appellant, as a witness in a criminal prosecution who had been assured that the defendant posed no real danger to him, enjoyed a special relationship with the City, through its police department, such that the City owed appellant a duty of care, which required it to warn appellant about Jenkins's subsequent threat to appellant's life." (*Carpenter* v. *City of Los Angeles*, *supra*, 230 Cal.App.3d at p. 931.)

The present case is readily distinguishable from both the *Wallace* and the *Carpenter* cases. Each of those cases fundamentally involved a duty on the part of the public entity to warn the witness of the existence and extent of the danger he or she faced. In each case, the police had misled the witness about the magnitude of the risk involved, by failing to warn the witnesses of a known risk or lulling them into a false sense of security.[7] In contrast here, plaintiff's allegations demonstrate that Torrez was wholly aware of the danger he faced, perhaps more fully comprehending the extent of that danger

---

[5]Carpenter, an employee of the North Hollywood United Artist Theaters, Inc., had been robbed by Jenkins while depositing theater receipts.

[6]Carpenter learned of the informant's warning to police when he subsequently returned to Los Angeles to testify at a preliminary hearing regarding the murder of Detective Williams, of which murder Jenkins was later convicted.

[7]*Schuster* v. *City of New York* (1958) 5 N.Y.2d 75 [180 N.Y.S.2d 265, 154 N.E.2d 534], also relied upon by plaintiff, is similarly distinguishable. In that action brought by the heirs of Arnold Schuster, who was killed after aiding police in capturing a criminal, it was alleged that ". . . the city failed to exercise reasonable care in supplying Schuster with police protection upon demand, that Schuster's death was due to negligence of the city in recklessly exposing him to danger, in advising him that the threats upon his life were not seriously made, in failing to supply him with a bodyguard and in heedlessly imparting to him a false impression of safety and lack of danger." (*Id.* at p. 79 [154 N.E.2d at p. 536].) It was based upon these circumstances that the New York Court of Appeals found there to be a duty on the part of the City of New York to use reasonable care in providing police protection to people who have aided in the apprehension or prosecution of criminals, "at least where reasonably demanded or sought." (*Id.* at p. 81 [154 N.E.2d at p. 537].)

than did the police or prosecutor. Although plaintiff alleges the police officers *assured* Torrez that no harm would come to him by giving a statement, there is no allegation that this *assurance* amounted to a specific or implicit undertaking to provide any protection for Torrez prior to, during, or after trial. The allegation is conclusory and far off the mark of a specific promise to protect Torrez from his fellow gang members. Although the trial court gave plaintiff the opportunity to amend her complaint, she did not in any way allege that in giving this assurance the police promised, expressly or impliedly, to protect Torrez, or that Torrez relied on this statement as a guarantee of his safety. Though given ample opportunity, the plaintiff did not allege that the statement " 'induced a false sense of security and thereby worsened' " Torrez's position. (See *Carpenter* v. *City of Los Angeles, supra*, 230 Cal.App.3d. at pp. 931-932, quoting *Williams* v. *State of California* (1983) 34 Cal.3d 18, 28 [192 Cal.Rptr. 233, 664 P.2d 137].) As such, the alleged statement by the police officers did not give rise to a special relationship between defendants and Torrez out of which a duty to protect arose.

Both the *Wallace* and the *Carpenter* courts recognized the distinction between a duty to warn and a duty to protect. As the *Wallace* court stated, "A finding that defendants owed Demetria a duty of care is not an end in itself; a person having a duty of care towards another may need to carry out that duty in one or more ways. Thus, the *Carpenter* court stated: 'Reasonable care required that the police, after lulling [Carpenter] into a false sense of security, inform him of this very real threat. [Citations.] We are speaking here of a duty to warn. As evidenced by the Witness Protection Program in which [Carpenter] was placed after being shot, the City already recognizes it has a duty to protect certain witnesses.' (*Carpenter* v. *City of Los Angeles, supra*, 230 Cal.App.3d at pp. 933-934 . . . .)" (*Wallace* v. *City of Los Angeles, supra*, 12 Cal.App.4th at p. 1401, fn. 7.) Neither the *Wallace* nor the *Carpenter* court had before it the question of whether and under what circumstances a duty to protect witnesses should be imposed, although the *Wallace* court assumed, in the context of determining whether governmental immunity applied, that such a duty would exist under the facts before it. (See *Wallace* v. *City of Los Angeles, supra*, 12 Cal.App.4th at p. 1403 [holding that although a detective's decision to offer Demetria to the district attorney as a prosecution witness may have been a discretionary one, his decisions to refrain from warning her about the danger and to refrain from offering her protection were not].)

In contrast, in the present case, we are not confronted with a duty to warn, but with a duty to protect. Clearly the imposition of the latter duty, which

requires the commitment of substantially greater resources than the former,[8] should be undertaken, if at all, only after careful consideration and in the context of an explicit and well defined commitment to do so.

Although it was not alleged here that there were any specific threats made against Torrez, we hardly doubt that a gang member harbors a justified fear of harm if he gives any assistance to law enforcement in the prosecution of gang-related crimes. Furthermore, it is a common circumstance for us to be confronted with incidents of this sort in criminal cases appealed to this court. In fact, in the prosecution of gang-related crimes the police must and regularly do interview and take statements from gang members. It is an unfortunate, and perhaps unavoidable, incident of gang affiliation that gang members who do cooperate with law enforcement may themselves become victims of gang violence.

While Torrez's fear unfortunately proved to be well founded in hindsight, the defendants had no duty to take special precautions to protect him from his fellow gang members. The complexity of providing such protection is obvious. When would a protection plan begin, how long would it last and how much of law enforcement's resources should be expended? Furthermore, when the alleged threat is generic and without reference to any particular individuals, as it is here, the problem of providing protection is especially difficult.

As a part of the Local Assistance Centers for Victims and Witnesses Law, Penal Code section 13835.5, subdivision (b) declares: "Comprehensive services may include the following optional services, if their provision does not preclude the efficient provision of primary services: . . . ▇ Witness protection, including arranging for law enforcement protection or relocating witnesses in new residences." ▇ It is clear that witness protection programs are optional tools of law enforcement. Whether a witness is to receive law enforcement protection is a discretionary decision to be made by law enforcement and the prosecuting authority. ▇ Therefore, absent a specific commitment by the Pomona police officers to protect Torrez against the vindictiveness of his gang, plaintiff has failed to allege a cause of action against the City of Pomona defendants.

The plaintiff argues that *Walker* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1393 [238 Cal.Rptr. 146], supports her contention that the defendants were obligated to protect her son. In *Walker*, a county animal

---

[8]For example, in contrast to the case before us, in *Carpenter*, fulfillment of defendant's duty would merely have "required a simple phone call by existing personnel." (*Carpenter* v. *City of Los Angeles, supra*, 230 Cal.App.3d at p. 935.)

control officer asked appellant to assist her in capturing an abandoned dog after she was unable to catch the dog on her own. Appellant consented, and was injured in his subsequent attempt to catch the dog. He then brought an action for negligence against the county, alleging that he was owed a duty of due care in connection with his attempt to capture the dog.

The court agreed, reversing the trial court's grant of summary judgment in favor of the county, and finding that a special relationship existed between Walker and the county, based on the county officer's request for assistance in the performance of a dangerous task which was part of the officer's official duties. Plaintiff contends, based on the reasoning of *Walker,* that she has properly alleged the existence of a special relationship between Torrez and the defendants based on their soliciting his assistance in prosecuting the Damper murder case, such that a duty to protect him arose.

The difference between a citizen's role in assisting an animal control officer and a citizen's role in assisting in a criminal prosecution, however, is of critical importance. While the plaintiff in *Walker* was asked to assist the officer, and he acceded to the request, he had no duty or obligation to do so. ▮▮▮ In contrast, it is a duty of citizenship in this country to assist law enforcement in the prosecution of crimes, as evidenced by the government's power to subpoena witnesses to appear and testify at trial. The benefit citizens derive from this arrangement is the enjoyment of living in a society which actively and effectively prosecutes crimes. The duty on the part of citizens to assist in criminal prosecution does not, however, give rise to a right to protection on demand. In a perfect world, that right would be assured, but law enforcement and government agencies charged with investigating and prosecuting crimes must instead operate in a world of budgetary constraints and limited resources.

We agree with the statement made by the court in *Carpenter,* albeit with different results, that "[c]riminal prosecution would screech to a grinding halt without the assistance of witnesses." (*Carpenter* v. *City of Los Angeles, supra,* 230 Cal.App.3d at 933.) If law enforcement agencies were held to owe a duty to protect every witness who is fearful of reprisal, with attendant liability for failure to do so, one can easily suppose that criminal investigations will be inhibited from the outset. Law enforcement officials will hesitate to question potential witnesses without first determining whether the funds exist to protect them. These and other considerations compel the conclusion that absent a specific undertaking to protect a witness, there is no

duty to do so in the course of investigating and prosecuting criminal activity.[9]

■ Because we find that the allegations of the plaintiff's complaint do not support imposition on the defendants of a duty to protect, we do not reach the issue of whether any form of governmental immunity applies to bar liability. However, we do note that the County of Los Angeles could only be held liable, if at all, through the acts of Deputy District Attorney Ferris. Moreover, the holding in *Falls* v. *Superior Court* (1996) 42 Cal.App.4th 1031 [49 Cal.Rptr.2d 908] absolves the district attorney when acting in his official capacity from liability. Ferris was clearly acting within his official capacity when he decided to use at trial the statement previously given by Torrez. Therefore, Deputy District Attorney Ferris and the county are entitled to absolute immunity from liability in this matter.

DISPOSITION

The judgment is affirmed.

Hastings, J., concurred.

ARANDA, J.*—I concur completely in the majority decision and reasoning. Even so, I must stress that the protection of witnesses should be of paramount public concern.

One of the principal foundations of our free society is our community's belief in the integrity of law enforcement. The minor herein, Moises Torrez, cooperated with law enforcement by voluntarily giving a statement. It matters not who he was or why he was at the scene of the crime. It is and it should continue to be the strong public policy of this state that persons who witness a crime must be encouraged to cooperate with law enforcement.

I see no misconduct by the police officers. The facts herein can only lead to the conclusion that the police officers meant what they said at the time

---

[9]We have not overlooked the policy discussion contained in the *Wallace* decision, but do not find it persuasive. ("If the result . . . we reach in the case before us brings about a greater level of official concern and action promotive of witness safety, and an appropriate devotion of public resources to that end, the long-term result surely will be an increase in both the effectiveness of the criminal justice system and the level of public confidence in it." (*Wallace* v. *City of Los Angeles, supra,* 12 Cal.App.4th at p. 1406).)

Although we do not reach the question of whether immunity exists to preclude the plaintiff from bringing this action against the City of Pomona and its police officers, we note that, were we to adopt the *Wallace* court's reasoning, we would be coming dangerously close to encroaching upon the realm of decisionmaking regarding budgetary and policy concerns which have been entrusted to other branches of government.

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

they guaranteed to Moises Torrez that his statement would not put him in danger.

The county's deputy district attorney deliberately and intentionally violated the detectives' guarantee. Thus, the police officers' warranty given to Moises Torrez when he gave his statement was rendered meaningless by the deliberate and calculated action of the county's deputy district attorney. The district attorney herein was also a named defendant in *Falls* v. *Superior Court* (1996) 42 Cal.App.4th 1031 [49 Cal.Rptr.2d 908]. In that case a witness, Edward Samaniego, after testifying in somewhat similar gang circumstances, was killed on August 17, 1992. The trial herein was on October 12, 1992, only 56 days after Samaniego's killing. And, Torrez too was dead a week later. His rights to life, liberty and the pursuit of happiness were over.

The death of this boy shocks the conscience. In order to obtain a conviction, the life of a witness was deliberately put in jeopardy if not outright sacrificed by the prosecution. If the United States Constitution's Fourteenth Amendment due process clause has any relevance in today's society, it must surely deny to the state and the county prosecutor, when acting under the color of law, the carte blanche power to place a 16-year-old's life in jeopardy. "[N]or shall any State deprive any person of life, liberty or property without due process of law . . . ."[1] At oral argument, appellant's counsel asked how many more times would this particular district attorney be granted prosecutorial immunity for such actions. The answer must lie with the Legislature. A prosecutor must have the requisite immunity to effectively seek justice. At the same time a witness must have the requisite safety to be willing to testify.

Yet, this case amply demonstrates, and I can only conclude, that absolute prosecutorial immunity, if permitted to have precedence over the safety of citizen witnesses of this state, may well have a chilling effect on any witness willing to voluntarily come forward to talk to law enforcement in the days to come.

---

[1]United States Constitution, article XIV, section 1. In *Buckley* v. *Fitzsimmons* (1993) 509 U.S. 259 [125 L.Ed.2d 209, 113 S.Ct. 2606], the United States Supreme Court indicates that there are limits to absolute prosecutorial immunity. Also see *Hertzke* v. *Riley* (E.D.Pa. 1989) 715 F.Supp. 117, 121.